## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

**NATIONAL COUNCIL OF NEGRO WOMEN,**          **PLAINTIFFS**
**EDUCATION, ECONOMICS, ENVIRONMENTAL,**
**CLIMATE AND HEALTH ORGANIZATION,**
**HEALTHY GULF and SIERRA CLUB**         **Case No.:** 1:22cv314 HSO-BWR

      **v.**

**PETER BUTTIGIEG and**
**U.S. DEPARTMENT OF TRANSPORTATION**         **DEFENDANTS**

## PLAINTIFFS' ORIGINAL COMPLAINT

## I.   BACKGROUND

1.     As explained further in this complaint, the U.S. Department of Transportation is subsidizing a money-losing project that has the express purpose of encouraging the destruction of designated Aquatic Resources of National Importance.  The DOT has done this without informing the public of all of the consequences for the human environment, and has refused to consider less damaging alternatives.  This violates the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.* As a consequence Sierra Club, National Council of Negro Women, Education, Economics, Environmental, Climate and Health Organization, and Healthy Gulf bring this action for declaratory, injunctive, and other relief.

2.     For well over a decade the City of Gulfport has encouraged commercial development of a large predominantly wetland area in the Turkey Creek watershed adjacent to the U.S. 49 and I-10 interchange. The wetlands in this part of the Turkey Creek watershed provide vital flood protection, wildlife habitat and other functions, and as a consequence were

designated by the U.S. Environmental Protection Agency as an Aquatic Resource of National Significance.

3.      The wetlands in this area are directly adjacent to the historic Forest Heights neighborhood, and upstream from the historic Turkey Creek community.  The Forest Heights neighborhood was developed in the mid-1960's as a cooperative project of the National Council of Negro Women, the U.S. Department of Housing and Urban Development, and the Ford Foundation.  It is named Forest Heights as a tribute to Dorothy Height, who was president of the National Council of Negro Women from 1947 to 1997.

4.      In July 2019 the City applied for a $20,000,000 grant from the U.S. Department of Transportation – referred to as a "BUILD grant" - to build a road for the specific purpose of providing access to 380 acres of this vital wetlands complex so it can be developed as up to 2,800,000 square feet of commercial space. As explained in this complaint, the U.S. Department of Transportation concedes that the costs of this project are likely to exceed its benefits, but it has refused to even examine other, better alternatives.  Further, the Department of Transportation has refused to even examine and inform the public of the impacts on flooding and neighboring communities of encouraging Wetlands of National Significance to be filled and developed for commercial real estate.

5.      Turkey Creek and this part of its watershed have been the subject of decades of planning efforts to protect these wetlands and preserve the resources of the Turkey Creek watershed for the community and the nation. These included purchasing for permanent preservation environmentally significant property that will be condemned and developed as part of the proposed road project.  In 2021 the threat of commercial development led to Turkey Creek

being named as the tenth most endangered river in America by the conservation group American Rivers.

6.      A part of the property in this area is owned by companies associated with the Ward family of Gretna, Louisiana and for convenience it is sometimes referred to as the Ward property. Permitting to allow construction of a road in this area has been the subject of past litigation in this Court. *See Ward Properties Gulfport, LLC et al v. United States Army Corps of Engineers,* No. 10-cv-00008 (S.D. Miss. Nov. 21, 2012)(invalidating permitting for road project).

7.      The proposed road runs through the Ward property and then north to a proposed bridge over I-10.  It is referred to as the "Airport Road Extension," or "Interconnecting Gulfport." The area and the proposed alignment of the road are shown in the figure below.



---
[1] Excerpt from Interconnecting Gulfport Final Environmental Assessment, Figure 3-3, September 14, 2022.

8.      In October 2017 the Mississippi Department of Transportation issued a Planning and Environmental Linkage study ("the MDOT U.S. 49 Study") which screened alternatives for improving mobility and improving safety along U.S. 49 and the ramps to I-10.  That study evaluated the Airport Road Extension and five other projects intended to address this need.  The Airport Road Extension ranked *dead last*, after other projects such as improving the intersections on U.S. 49.

9.      The City of Gulfport's BUILD grant application stated that "the purpose of the project is to provide a transportation infrastructure network in good operating condition that will **encourage existing and support new commercial and economic growth**."[2] The project aims to "interconnect established commercial centers within the City of Gulfport," "[pave] the way for business growth and business expansion," "encourag[e] additional commercial development," and "supplement the City's regional economic competitiveness."[3]  The application states that the grant was justified in part because the proposed road would provide direct public access to 380 acres in "the City's most aggressive commercial zone," and could create up to 2,800,000 square feet of new commercial development.[4]  Gulfport predicted the specific number of new jobs that would be created from this commercial real estate development, and further predicted sales tax benefit to the City of $2,000,000 per year.   The application states that "[i]n providing the additional public rights-of-way that would be created through this project, approximately 380 acres of land within the City's most aggressive commercial zone would have direct public access where before there was none. With the interstate interchange in close proximity, **this newly**

---

[2]  Interconnecting Gulfport, Grant Application for USDOT National Infrastructure Investments - BUILD Discretionary Grants (July 2019) at 11 (emphasis added).
[3] *Id*. at 3-4, 11-12.
[4] *Id*. at 12.

**accessible commercial area would be primed for quick development**."[5] The application concludes that "**[t]he largest anticipated benefit of this project is more of an economic impact than a direct project benefit**," and that the project will "promote future development by providing direct public access and services to 380 acres of real estate in the City's least restrictive and most traveled commercial zone."[6]

10.      Presumably because it is is the primary criterion for BUILD grants, the City of Gulfport also stated that "[t]he chief focus of this project is commuter, pedestrian and cyclist safety."[7] However, the grant application contains no information about the numbers of pedestrians or cyclists who would purportedly benefit from the project.

11.      Under the National Environmental Policy Act federal agencies like the U.S. Department of Transportation are required to evaluate proposed actions, including funding projects like the Airport Road Extension, to determine their direct and indirect impacts on the human environment, and also evaluate reasonable alternatives to those actions. As detailed later in this complaint, that evaluation may take the form of an Environmental Impact Statement, or in some cases an Environmental Assessment.  Regardless of the kind of document prepared, the statute requires full disclosure to the public of the direct and indirect impacts of the agency action, and the possible alternatives.

12.      In June 2022, the City of Gulfport released a Preliminary Environmental Assessment for the Airport Connector Road.  This document was prepared by an engineering firm under contract to the City of Gulfport.  This Preliminary EA, contrary to the BUILD grant application, defined the purpose of the project almost exclusively in terms of relieving congestion on U.S. 49:

---

[5] *Id*. at 12 (emphasis added).
[6] *Id*. at 27(emphasis added).

The purpose and need for this project is to improve the flow of vehicular traffic around the Interstate 10 and US 49 Interchange. The volume of traffic has grown over the years, and the congestion that now exists is projected to become even more problematic. As noted, there are several ongoing and planned developments that will be generating even more traffic which will only exacerbate the situation.

\* \* \*

In addition to the need for improved circulation, the project also considers safety concerns due to the proximity of the railroad spur that constricts movements of local traffic and emergency vehicles between the Gulfport Premium Outlets and US 49.[8]

13.     The Preliminary EA referenced a traffic study that was included in the BUILD grant application.  However, that traffic study actually showed that the project would *increase* delays on U.S. 49.  The Preliminary EA did not consider any of the alternatives the 2017 MDOT U.S. 49 Study identified as superior to the Airport Road Extension Project.  The Preliminary EA also did not contain any information on the impacts on wetlands or traffic counts related to the 2,800,000 square feet of commercial development that would result from providing access to the 380 acre area "primed for quick development."  The Preliminary EA, like the BUILD grant application, contained no information the number of pedestrians or cyclists who would supposedly benefit from the project.

14.     In its BUILD grant application, the City of Gulfport estimated that the Airport Connector Road would have costs of approximately $35,000,000 and would have a discounted positive cost-benefit ratio of 1.2.  The documentation which purportedly supported this cost-benefit analysis has never been made fully available to the public. The information that has been made available shows much of the supposed benefits were associated with claimed reductions in emergency response times to an adjacent shopping center.

---

[7] *Id*. at 10.
[8] Interconnecting Gulfport Preliminary Environmental Assessment (Apr. 2022) ("Preliminary EA") at 2-1.

15.     The Preliminary EA revealed, however, that costs of the Airport Road Extension had ballooned to $48,500,000. The Preliminary EA nonetheless contained no revised cost/benefit analysis, although it does state that the costs of the project are likely greater than the benefits.

16.     The Plaintiffs in this action provided detailed comments to the City of Gulfport and its contractors requesting that an Environmental Impact Statement be prepared and pointing out the issues set out above as well as the others stated in this complaint. Among other data, the Plaintiffs provided the City and its contractors with expert evidence that commercial development on the scale the City of Gulfport asserted to justify a BUILD grant subsidizing the road would generate an additional *78,000 automobile trips per day.* The Plaintiffs provided additional documentation showing that the project now had a negative cost-benefit ratio.

17.     On or about September 14, 2022, the U.S. Department of Transportation signed a Final Environmental Assessment for the Airport Road Extension. In contrast to the multiple asserted reasons for the project in the BUILD grant application, the purpose and need statement in the Final EA states that "[a]s presented in the grant 'Interconnecting Gulfport,' a purpose of this project is to provide transportation infrastructure that will improve the flow of vehicular traffic around the Interstate 10 and US 49 interchange and that will encourage existing and support new commercial and economic growth." The purpose and need statement also states that "in addition to the need for improved circulation, the project addresses BUILD grant criteria related to safety, and economic competitiveness."[9]

18.     Like the Preliminary EA, the Final EA did not consider the impacts of wetlands destruction and increased traffic from the commercial development the project is intended to spur, did not evaluate any of the superior alternatives from the 2017 MDOT U.S. 49 Study, and provided no information on how the cost/benefit analysis was calculated. The Final EA included

a new traffic study apparently performed in August 2022, which purported to show that the project would make some marginal improvements in congestion on U.S. 49. The public was never given the opportunity to evaluate or comment on this study. **The Final EA conceded that the costs of the Airport Road Extension likely outweighed its benefits but stated that the agency would fund the project anyway.**

19.     Based on the Final EA, the U.S. Department of Transportation found that there would be no significant impacts to the human environment from construction of the Airport Road Extension and declined to perform a full Environmental Impact Statement.

20.     For the reasons set out below, the U.S. Department of Transportation's decisions on the approval and content of the Final EA for the Airport Road Extension were arbitrary, capricious and contrary to law. The decision should be reversed, and the matter remanded to the agency for preparation of a full Environmental Impact Statement.

## II.     JURISDICTION

21.     Sovereign immunity as to the matters in this suit is waived by the Administrative Procedures Act, 5 U.S.C. §§ 701-706. This Court has jurisdiction over the claims set forth in this Complaint pursuant to 28 U.S.C. § 1331 (federal question) and 1346 (United States as defendant).

## III.     VENUE

22.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and (e), because the property where the proposed Airport Road Expansion is to be located is situated within the Southern District of Mississippi.

---

[9] Final EA at 2-1.

## IV.   PARTIES

### A.   Plaintiffs

23.   The National Council of Negro Women (NCNW) was founded in 1935 as a coalition of twenty-nine religious, professional, political and social groups.  The NCNW was founded with a vision of an active role in public affairs for Black women.  Over the eight decades of its existence the NCNW has fought against racism, lynching and discrimination, and for housing and jobs.  Its mission today remains to lead, advocate for and empower women of African descent, their families and communities.  The Gulfport Section of the NCNW carries out this mission in many ways including hosting community health fairs, feeding the homeless, and supporting STEM programs for coast youth. As set out above, NCNW was a founder of the Forest Heights neighborhood and its members remain active in protecting the neighborhood. NCNW and its members would be adversely affected by the construction, operation and induced development caused by the proposed road,  including but not limited to impacts on air, water, wetlands, fish and wildlife, and flooding.

24.   Education, Economics, Environmental, Climate and Health Organization (EEECHO) is a Mississippi non-profit corporation.  Its members are a coalition of diverse education, economics, health, environmental justice, climate justice, religious and policy advocates that represent the interest of building a better Gulf region. Based in Gulfport, Mississippi, EEECHO advances its mission through policy analysis and grassroots leadership, while collaborating with different grassroots and national organizations. EEECHO and its members would be adversely affected by the construction, operation and induced development caused by the proposed road,  including but not limited to impacts on air, water, wetlands, fish and wildlife, and flooding.

25.     Healthy Gulf is a not-for-profit membership corporation incorporated under the laws of the State of Louisiana. Healthy Gulf maintains offices in New Orleans, LA, Madison, MS, and St. Petersburg, FL.  Its mission is to unite and empower people in protecting and restoring the Gulf Region's natural resources.  It has members nationwide.  Included in its membership are persons who live, work, or recreate in the vicinity of the area that will be affected by the proposed road.  Healthy Gulf and its members would be adversely affected by the construction, operation and induced development caused by the proposed road, including but not limited to impacts on air, water, wetlands, fish and wildlife, and flooding.

26.     The Sierra Club is a national non-profit environmental membership organization whose purpose is to explore, enjoy and protect the planet; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives. The Sierra Club's Mississippi chapter is the state chapter of the national Sierra Club organization and has as its mission the protection of Mississippi's environment.  It has approximately 1600 members.  Included in its membership are persons who live, work, or recreate in the vicinity of the proposed Airport Road Extension. Sierra Club and its members would be adversely affected by the construction and operation of the Airport Road Extension,  including but not limited to impacts on air, water, wetlands, flood control, fish and wildlife, and traffic.

27.     Plaintiffs and their members have participated extensively at every opportunity in this process.  In April 2022, members collected over 500 signatures in opposition to the project, and submitted individual comment letters. Members attended in person public meetings, gave oral comments, and submitted written comments on the Preliminary Environmental Assessment.

28.    Plaintiff's members include members who live in or near the Forest Heights community and will be adversely affected by the increased commercial development, flooding, traffic and traffic hazards, air and noise pollution, water contamination, impacts to birds and fish, and other impacts of the Airport Road Extension *and* the U.S. Department of Transportation's failure to provide the information on these impacts as required under NEPA.  EEECHO, NCNW, Healthy Gulf and Sierra Club member Katherine Egland has lived in her Gulfport home for 43 years.  Her life's mission is to preserve and protect the historic African American community and nearby Turkey Creek, which she believes are national treasures and are a source of great pride to her. Ms. Egland believes the impacts of the Airport Road Extension would jeopardize her community and the Turkey Creek ecosystem. The Final EA's failure to disclose and analyze all the potential impacts of the project impairs her ability to evaluate and comment on the proposal, and to disseminate the information to her neighbors. Ms. Egland is concerned that the destruction of wetlands for the project and related future commercial development will increase flooding in the North Gulfport community. She is also concerned that increased traffic due to induced commercial development will cause more traffic jams and traffic injuries, air and water pollution and noise in the community. Ms. Egland frequents Turkey Creek to birdwatch and enjoy the water and sponsors outdoor education trips there to teach about the unique value of Turkey Creek's ecosystem and raise awareness about the importance of protecting it.  Ms. Egland is concerned that she will no longer be able to enjoy birdwatching or the wetlands because of the project's development and the induced development it will bring. She is concerned that birds and carnivorous plants she enjoys will be negatively impacted by the wetland destruction.

11

29.     To the extent that construction of the Airport Road Extension is permitted without compliance with the law, Plaintiffs and their members will suffer irreparable injury. The destruction of wetlands and habitat in the footprint of the project without compliance with the law will irreparably injure the Plaintiffs. As set out above, some of the area in the footprint of the project was actually purchased for preservation due to its habitat and other value.

30.     The U.S. Department of Transportation's approval of the grant subsidizing the Airport Road Extension is based on an inadequate environmental review and the agency's failure to follow requisite procedures deprives Plaintiffs and their members of information to which they are entitled under NEPA. Vacatur of the Final EA would redress the injuries to Plaintiffs and their members and supporters by requiring the United States Department of Transportation to conduct a meaningful review of the environmental impacts of the Airport Road Extension. Additionally, complying with NEPA may cause the agency to change its position.

**B.     Defendants**

31.     Peter Buttigieg is the Secretary of the United States Department of Transportation and is responsible for the actions of the U.S. Department of Transportation.  He is sued in his official capacity.

32.     The United States Department of Transportation is the federal agency responsible for the administration of the BUILD grant program that will provide much of the funding for the Airport Road Extension.

33.     The Final EA was approved by the Federal Highway Administration, a unit of the U.S. Department of Transportation.

34.     The U.S. Department of Transportation is headquartered in Washington, D.C. and may be served at 1200 New Jersey Ave South, Washington, D.C. 20590.

## V.      RELEVANT LEGAL AUTHORITY

### A.      Administrative Procedure Act

35.      The Administrative Procedure Act, 5 U.S.C. § 702, provides that a person suffering a legal wrong because of agency action, or affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review.  5 U.S.C. § 706 provides that the Court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

### B.      National Environmental Policy Act

36.      NEPA, 42 U.S.C. §§ 4321–4370m, is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (2019). It makes environmental protection part of the mandate of every federal agency, 42 U.S.C. § 4331, and requires federal agencies to take environmental considerations and "any irreversible and irretrievable commitments of resources" into account in their decisionmaking "to the fullest extent possible," *id*. § 4332; 40 C.F.R. § 1500.2 (2019).

37.      NEPA seeks to ensure that federal agencies take a "hard look" at environmental consequences before taking a major action. *Friends of the Boundary Waters Wilderness v. Dombeck*, 164 F.3d 1115, 1128 (8th Cir. 1999). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA also "guarantees that the relevant information [concerning environmental impacts] will be made available to the larger audience," including the general public, "that may also play a role in both the decisionmaking process and the implementation of that decision." *Id*.

13

38.     NEPA requires federal agencies to fully disclose in "every recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment, a detailed statement" on, among other things, "the environmental impact of the proposed action" and "any adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(C). This statement is referred to as an Environmental Impact Statement ("EIS").

39.     The EIS must describe (1) the "environmental impact of the proposed action," (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented," (3) any "alternatives to the proposed action," and (4) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id*.

40.     NEPA also requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of the analysis. 40 C.F.R. §§ 1500.1(b), 1502.24 (2019).[10] Agencies "shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement." *Id*. § 1502.24 (2019). Major federal actions include "new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies," 40 C.F.R. § 1508.18(a) (2019), and "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." *Id.* §

---

[10] Although the substance of the NEPA obligations set out in this complaint have not changed, the text of some of the regulations were modified in 2020 and 2022. The revisions permitted agencies to apply the regulations in effect prior to 2020 for certain activities. 40 C.F.R. § 1506.13.  The Final EA cites to the pre-2020 regulations, Final EA at 4-114, so for consistency this complaint cites to those versions as well.

1508.18(b)(4) (2019). The word "major" "reinforces but does not have a meaning independent of significantly." *Id*. § 1508.18 (2019).

41.     If it is unclear whether impacts are significant enough to warrant an EIS, a federal agency may prepare an "environmental assessment" ("EA") to assist in making that determination. *Id*. §§ 1501.3, 1508.9 (2019). If the agency determines that no EIS is required, it must document that finding in a "finding of no significant impact" ("FONSI"). *Id*. § 1508.13 (2019).

42.     If the agency concludes in an EA that a project may have significant impacts on the environment, then an EIS must be prepared. 40 C.F.R. § 1501.4 (2019).

43.     To determine whether a proposed action may significantly affect the environment, the agency must consider both the context (i.e., the import of the action on society, the regions or localities affected, and the interests affected by the action) and intensity (i.e., the "severity of impact") of the proposed action, including whether the project will take place in "ecologically critical areas" and whether the project will affect endangered species. *Id*. § 1508.27 (2019).

44.     With respect to the latter, the regulations lay out, and he courts have considered, ten factors that are to be considered. Examples of these criteria include the degree to which: the proposed action affects public health or safety; the possible effects on the human environment are likely to be highly controversial; the possible effects on the human environment are highly uncertain or involve unique or unknown risks; the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration; the action is related to other actions with individually insignificant but cumulatively significant impacts; and the action may adversely affect an endangered or threatened species or its habitat. *Id*.

45. A NEPA analysis must include a "range of actions, alternatives, and impacts." 40 C.F.R. § 1508.25 (2019). For example, an agency must consider direct and indirect impacts, or effects, of an action when determining the scope of a NEPA analysis. *Id*. § 1508.25(c)(1)–(2) (2019). The direct effects of an action are those effects "which are caused by the action and occur at the same time and place." *Id*. § 1508.8(a) (2019). The indirect effects of an action are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b) (2019).

46. An agency also must analyze and address the cumulative impacts of a proposed project. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976); 40 C.F.R. §§ 1508.7 (2019), 1508.25(c)(3) (2019). Cumulative impacts are the result of any past, present, or reasonably foreseeable future actions, regardless of who takes them. Such effects "can result from individually minor but collectively significant actions taking place over a period of time." *Id*. § 1508.7 (2019).

47. "[A] meaningful cumulative impact analysis must identify (1) the area in which the effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, present, and proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate." *Del. Riverkeeper Network v. Fed. Energy Regul. Comm'n*, 753 F.3d 1304, 1319 (D.C. Cir. 2014) (quoting *Grand Canyon Trust v. F.A.A.*, 290 F.3d 339, 345 (D.C. Cir. 2002)).

48. Cumulative impact analyses are insufficient when they discuss only the direct effects of the project at issue on a small area and merely contemplate other projects but have no

quantified assessment of their combined impacts. *Bark v. U.S. Forest Serv.*, 958 F.3d 865, 872 (9th Cir. 2020).

49.     Agencies cannot avoid their responsibility to consider future effects by claiming they are uncertain, because NEPA requires some element of predictive behavior. *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1078–79 (9th Cir. 2011); *see also* 40 C.F.R. § 1502.22 (2019).

50.     40 C.F.R. § 1508.8(a)(2019) provides that indirect effects of an action may include "growth inducing effects and other effects related to induced changes in the pattern of land use . . . and related effects on air and water and other natural systems, including ecosystems." With respect to road projects in particular, agencies may not assume with no evidence that the construction of the project will have no effect on growth in the area. This is particularly true when one purpose of the project is specifically stated to be encouraging development of undeveloped property adjacent to the project. The Council on Environmental Quality, which is responsible for overseeing implementation of NEPA, has stated that an agency "cannot ignore uncertain, but probable, effects of its decisions." *NEPA's Forty Most Asked Questions,* Question No. 18, 46 Fed. Reg. 10826.

51.     Agencies also may not rely on the claim that some other entity or agency will insure compliance with environmental laws or mitigate impacts at some point in the future. Rather, the agency must carry out its own independent analysis. *State of N.C. v. F.A.A.*, 957 F.2d 1125, 1129–30 (4th Cir. 1992) (citing *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1122–27 (D.C.Cir.1971).

52.     "NEPA procedures must insure that environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id*. §

1500.1(b) (2019). An agency's failure to include and analyze information that is important, significant, or essential renders an EA and FONSI inadequate. *See id*. § 1500.1 (2019).

53. Regulations promulgated by the CEQ to implement NEPA describe the consideration of alternatives as "the heart" of the NEPA process and must provide "a clear basis for choice among options by the decisionmaker and the public." 40 C.F.R. § 1502.14 (2019). The purpose of the requirement to consider alternatives is "to insist that no major federal project should be undertaken without intense consideration of other more ecologically sound courses of action, including shelving the entire project, or of accomplishing the same result by entirely different means." *Environmental Defense Fund v. Corps of Engineers*, 492 F.2d 1123, 1135 (5th Cir. 1974).

54. "No decision is more important than delimiting what these 'reasonable alternatives' are [since] [o]ne obvious way for an agency to slip past the strictures of NEPA is to contrive a purpose so slender as to define competing 'reasonable alternatives' out of consideration (and even out of existence)." *Simmons v. United States Army Corps of Engineers*, 120 F.3d 664, 666 (7th Cir. 1997).

## VI.    CAUSES OF ACTION

55. The facts set forth in the preceding paragraphs are adopted herein.

### Cause of Action No. 1:

**The United States Department of Transportation's failure to prepare an Environmental Impact statement violated NEPA.**

56. The U.S. Department of Transportation's decision to subsidize the Airport Road Extension Project through a BUILD grant was a major federal action that required compliance with NEPA.

18

57.     The direct and indirect impacts of the Airport Road Extension meet the criteria for significance set out in 40 C.F.R. § 1508.27 (2019). Further, the U.S. Department of Transportation failed to address the indirect impacts of the Airport Road Extension, and failed to provide record evidence demonstrating that the project's impacts would be mitigated below the level of significance. *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 230 (5th Cir. 2007).

58.     The agency should therefore be ordered to prepare an Environmental Impact Statement, or in the alternative the matter should be remanded to the agency for further consideration.

## Cause of Action No. 2:

**The United States Department of Transportation's failure to adequately consider the direct, indirect and cumulative impacts of its decision violated NEPA.**

59.     The U.S. Department of Transportation acted arbitrarily and capriciously in failing to analyze all of the direct and indirect effects of its approval of a grant to subsidize the construction of the Airport Road Extension.  The Final EA for the project did not examine multiple environmental effects, including indirect impacts due to induced growth, impacts to conservation, special aquatic sites, and the economy.

60.     The Airport Road Extension Final EA fails to address and provide the agency and the community with full information on the direct, indirect and cumulative impacts of the project, in at least the following respects:

(a) Failure to consider all indirect, secondary and cumulative impacts of development, in particular the commercial real estate development that is the actual purpose of the project;

(b) Failure to project and use induced growth in traffic counts, both from the project itself and from the commercial real estate development that is the actual purpose of the project;

(c) Failure to include a full and properly supported cost-benefit analysis, despite the concession that the costs of the proposed road likely outweigh its benefits;

(d)  Failure to consider and provide the public with information on the full direct and indirect impacts of the project itself to wetlands, including Wetlands of National Significance;

(e) Relying on conclusory statements for the proposition that any impacts on wetlands would be mitigated below the level of significance in the permitting process under Clean Water Act Section 404, 33 U.S.C. § 1344.

## Cause of Action No. 3:

**The U.S. Department of Transportation failed to consider reasonable alternatives in violation of NEPA.**

61.    The U.S. Department of Transportation had a duty under NEPA to rigorously explore, and objectively assess, all reasonable alternatives.  In fulfillment of this duty considered to be "the heart of the environmental impact statement"—the Corps was required to assess all reasonable alternatives in detail, allowing reviewers to evaluate their comparative merits.

62.    The agency breached this duty by refusing to analyze the practicable alternatives stated in the 2017 MDOT U.S. 49 Study.  The U.S. Department of Transportation's refusal was based on the assertion that "the airport road corridor is the only corridor that falls within the City's jurisdiction."  Final EA at 3-5.  However, the CEQ has explained that "[i]n determining the scope of alternatives to be considered, the emphasis is on what is 'reasonable' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant. CEQ, "Forty Most Asked Questions Concerning CEQ's NEPA Regulations" (Mar. 16, 1981), Question 2a.  An agency must therefore considerable reasonable

alternatives even if they are outside the jurisdiction of the agency itself, and even if the alternative would require a change in the law. *Env't Def. Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1135 (5th Cir. 1974); CEQ, Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, Question 2b (1981) ("An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable").

63.     The U.S. Department of Transportation's refusal to consider other reasonable alternatives violates NEPA and requires reversal and a remand to the agency.

## Cause of Action No. 4

### Failure to Provide Information Supporting the Claims in the Final EA.

64.     40 C.F.R. § 1506.5 (2019) provides that a federal agency like the U.S. Department of Transportation must independently evaluate the information submitted to it and is responsible for its accuracy, scope and contents.  Further, agencies are required to make the data on which they rely available to the public. 40 C.F.R. § 1502.24 (2019).  Information from responsible experts and other agencies cannot be ignored, but the agency must provide some response.

65.     In the Final EA the U.S. Department of Transportation failed to provide any reasoned response to issues raised by the United States Environmental Protection Agency, the Plaintiffs, and other commenters regarding the induced development caused by the project in Wetlands of National Significance, the increased traffic caused by the project, the basis for the agency's conclusions regarding costs and benefits, the number of cyclists and pedestrians who would purportedly benefit from the project, and other critical factual issues.  This requires reversal and a remand.

## VII.   PLAINTIFFS' REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a)  Declare that the U.S. Department of Transportation violated NEPA, its implementing regulations, and the APA by failing to prepare an EIS;

b)  Declare that the U.S. Department of Transportation violated NEPA by failing to prepare a proper Environmental Assessment in the respects set out above;

c)  Vacate and set aside the challenged decision;

d)  Order the U.S. Department of Transportation to prepare an EIS to cure all violations of NEPA, its implementing regulations, and the APA;

e)  To the extent necessary issue a preliminary and permanent injunction against the U.S. Department of Transportation and any entity acting under the authority of its decision, enjoining any irreversible and irretrievable commitment of resources for the Airport Road Extension Project;

f)  award Plaintiffs their reasonable attorneys' fees and costs for this action; and

g)  grant such other and further relief as may be just and proper.

DATED: November 17, 2022

Respectfully submitted,

*/s/ Robert B. Wiygul*
Robert B. Wiygul (MSB #7348)
Waltzer Wiygul & Garside LLC
1011 Iberville Dr.
Ocean Springs, MS 39564
Tel: (228) 872-1125
Fax: (228) 872-1128
robert@wwglaw.com

Andrea Issod (CA Bar #230920)*
Sierra Club Environmental Law Program
2101 Webster St., Ste. 1300
Oakland, CA 94612
Tel: (415) 977-5544
Fax: (415) 977-5793
andrea.issod@sierraclub.org
*Pro Hac Vice pending

*Attorneys for Plaintiffs*