**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **NATIONAL COUNCIL OF NEGRO WOMEN, et al.** | § § § § | **PLAINTIFFS** |
| **v.** | § § § | **Civil No. 1:22-cv-314-HSO-BWR** |
| **SEAN DUFFY,** *in his official capacity as U.S. Transportation Secretary*, **and U.S. DEPARTMENT OF TRANSPORTATION** | § § § § § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION [66] FOR CONSIDERATION OF EXTRA-RECORD EVIDENCE**

Plaintiffs National Council of Negro Women, the Education, Economics, Environmental, Climate and Health Organization, Healthy Gulf, and the Sierra Club (collectively, "Plaintiffs") appeal an administrative agency decision originally before the United States Department of Transportation (the "DOT") and request consideration of evidence outside the administrative record. *See* Mot. [66]. The Court finds that this Motion [66] should be denied.

## I. BACKGROUND

### A. Factual Background

In July 2019, the City of Gulfport, Mississippi (the "City" or "Gulfport"), applied for "a $20,000,000 grant from the [DOT]—referred to as a 'BUILD grant'— to build a road" which passes through "a large predominantly wetland area in the Turkey Creek watershed adjacent to" a major roadway interchange at U.S. Highway 49 ("U.S. 49") and Interstate 10 ("I-10") in north Gulfport. Compl. [1] at 1-

2.  The Environmental Protection Agency (the "EPA") designated these wetlands as an aquatic resource of national importance due to the role they play in flood and wildlife protection.  *See* R. [37-2] at 103.[1]

The proposed road development, referred to by the parties as the "Airport Road Extension," or the "Interconnecting Gulfport" project (the "Project"), Compl. [1] at 3,

> begins on Poole Street at the eastern limit of a reconstructed intersection with Old US 49 . . . .  [It] continues west . . . along the Poole Street corridor a short distance before starting a slight reverse curve to the north near the centerline of Old US 49 . . . .  Alternative C then curves to the north and upon completing the curve crosses the [Kansas City Southern ("KCS")] spur line . . . . North of the spur line crossing, a roundabout is proposed where Alternative C intersects a southwest extension of the two-lane divided Factory Shop Boulevard . . . .  [As Alternative C] continues northwest from the roundabout, [it] . . . makes a bridged crossing over I-10 . . . and terminates at a roundabout intersection . . . . The other two roads intersecting opposite each other at the roundabout are a relocated lighted section of the Canal I-10 Service Road . . . and a lighted extension of the four-lane divided Daniel Boulevard . . . .  34th Avenue would connect to the north side of the extension of Daniel Boulevard slightly east of the roundabout,

R. [53-5] at 36, 40; *see also id.* at 35; R. [40-3] at 41-45.  In addition to providing transportation infrastructure, the Project would also allow for future economic development in the area.  *See* R. [53-8] at 134; R. [53-5] at 23; R. [40-3] at 29.

Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and in June 2022, the Mississippi Department of Transportation (the "MDOT"), in coordination with the DOT,[2] published a Preliminary Environmental

---

[1] All citations to the administrative record and the parties' briefs are to the page numbers generated by CM/ECF.

[2] At times, the Federal Highway Administration ("FHWA") acted rather than the DOT.  But because the FHWA is a branch of the DOT, *About FHWA*, U.S. DEPT. OF TRANSP.,

Assessment (the "Preliminary EA").  *See* R. [40-3] at 7.  The Preliminary EA included a 2020 traffic study (the "Original Study") conducted by the engineering consultant firm Neel-Schaffer, Inc. ("Neel-Schaffer") to assist in evaluating the Project.  *See* R. [42-2] at 84 to -[42-3] at 9.  It looked at traffic patterns at the intersection of U.S. 49, Poole Street, and Airport Road.  *See id.*  Specifically, the study focused on Level of Service ("LOS")[3] metrics during the peak P.M. hour for three different conditions: existing conditions as of 2019; 2045 future conditions if nothing is built; and 2045 future conditions if a roadway alternative is built.  *See* R. [40-3] at 34; R. [42-3] at 1, 5, 9.  The Preliminary EA also included traffic models from the Gulf Regional Planning Commission ("GRPC"), looking at no-build versus build traffic projections for the years 2025 and 2045.  *See* R. [42-4] at 28-35.

The study showed marginal, if any, improvements to the intersection at U.S. 49, Poole Street, and Airport Road, finding that its overall LOS grade drops from a "C" to an "F" regardless of whether the Project is built.  *See* R. [40-3] at 34; R. [42-3] at 1, 5, 9.  But the GRPC models showed a reduction in average daily traffic on the southern side of the Interchange from 89,705 to 86,757 vehicles per day.  *See* R. [42-

---

https://highways.dot.gov/about/about-fhwa (last visited March 16, 2026), and because the DOT is named as a Defendant, the Court will refer to the DOT and the FHWA collectively as the "DOT."

[3] "Level of service (LOS) is the term used to refer to a collection of measures of automobile congestion and travel time delay, and it is among the longest-standing and most widely adopted metrics for reporting transportation system performance in the country." *Evolving Use of Level of Service Metrics in Transportation Analysis – Introduction*, U.S. DEPT. OF TRANSP. (2017), https://www.transportation.gov/sites/dot.gov/files/docs/LOS%20Case%20Study%20Introduction_508.pdf (last visited March 16, 2026).  An intersection with an LOS rated "A" is "the most desirable condition and reflects conditions in which a user can expect the least amount of delay," while an "F" indicates significant delays and may also mean that demand at that intersection has exceeded capacity.  R. [53-8] at 218.

4] at 33, 35.  The study did not consider future traffic as a direct result of induced development.

During the public comment phase on the Preliminary EA, Plaintiff Sierra Club submitted a comment (the "Comment") detailing its objections to the Project. *See generally* R. [53-20] at 18-59; R. [46-5] at 145-57.  The Comment argued that the Project's net impact on traffic congestion in the area will actually be much worse than the Preliminary EA estimated due to the traffic generated by future development.  *See* R. [53-20] at 22.  It included a report by traffic engineer Adam Kirk ("Dr. Kirk"), which found that "[t]his high volume of traffic [from future development] on the Airport Road Extension will further impact traffic operations on US 49 at the I-10 Interchange, significantly more than is shown to occur with only the road connection" in the Preliminary EA.  *Id.* at 43.  Essentially, it argued that if the Original Study were performed correctly, it would actually reflect an increase in traffic congestion and that the Project's costs would ultimately exceed its benefits.  *See id.* at 42-44; Mem. [67] at 2-3.

In the fall of 2022, the DOT approved the Final Environmental Assessment ("Final EA").  *See* R. [53-4] at 93.  It includes a Finding of No Significant Impact ("FONSI"), stating that "[t]he Federal Highway Administration has determined that this project's Proposed Action and the selected [roadway alternative], as described in the project's Environmental Assessment, will have no significant impact on the human or natural environment."  *Id.* at 94 (italics omitted).  The Final EA also

reflects several modifications that the MDOT and DOT made in response to the public comment period.

Notably, the Final EA includes an updated traffic study (the "Updated Study") attached in Appendix B, which was again prepared by Neel-Schaffer in August 2022.  *See* R. [53-8] at 203-222; *see generally* R. [53-8] at 190 to -[53-9] at 18. According to the Updated Study, its purpose was to "expand[] the traffic analysis" and collect new traffic counts "to revise the previous analysis and expand it to include three additional signalized intersections along US 49 . . . ," R. [53-8] at 207. It concluded that

> while the new roadway does not completely alleviate traffic congestion along US Highway 49, it does improve overall delay when compared to the No Build and offers an alternate route for through traffic and additional access points for existing developments west of US Highway 49 including a new connection across I-10.

*Id.* at 221.  The Updated Study likewise did not consider future traffic as a direct result of induced development.  Additionally, it was released after the public comment period had ended and, therefore, Plaintiffs did not have an occasion to comment on its substance.  Mem. [67] at 3.

B.    <u>Procedural History</u>

On November 17, 2022, Plaintiffs filed this lawsuit under the Administrative Procedures Act ("APA"), 5 U.S.C. § 702, against the DOT and Secretary of Transportation Peter Buttigieg in his official capacity,[4] claiming several violations

---

[4] Pursuant to Federal Rule of Civil Procedure 25(d), current Secretary of Transportation Sean Duffy is automatically substituted for his predecessor and originally named defendant, Peter Buttigieg. This substitution was formalized on March 17, 2026.  *See* Text Only Order entered March 17, 2026.

of NEPA, 42 U.S.C. §§ 4321, *et seq.  See* Compl. [1] at 13-21.  Plaintiffs allege that the DOT violated NEPA when it: (1) issued the BUILD grant without preparing an EIS, *see id.* at 18-19; (2) failed to adequately consider the direct, indirect, and cumulative impacts of its decision to approve the Project, *see id.* at 19-20; (3) did not consider reasonable alternatives to the Project, *see id.* at 20-21; and (4) failed to provide information supporting the claims in the Final EA, *see id.* at 21.  Plaintiffs ask the Court to declare that the DOT violated NEPA, vacate the DOT's decision, order it to prepare an EIS, and issue any injunctions necessary to prevent irreversible harm to the wetlands endangered by the Project.  *See id.* at 22. Plaintiffs also seek attorneys' fees and other relief.  *See id.*

On July 14, 2023, Defendants filed the certified administrative record with the Court, *see* Notice [14], which they amended once on September 20, 2024, *see* Notice [64].  Plaintiffs requested that Dr. Kirk prepare a new report (the "Kirk Report") evaluating the Updated Study published in the Final EA.  *See* Mem. [67] at 3.  The Kirk Report was finalized on February 28, 2024, *see* Ex. [66-1] at 1, and on October 18, 2024, Plaintiffs submitted a Motion [68] for Summary Judgment, *see* Mot. [68], and the present Motion [66] for Consideration of Extra-Record Evidence, seeking to supplement the final administrative record with the Kirk Report, *see* Mot. [66].

## II.  STANDARD OF REVIEW

The APA entitles a person who has suffered a legal wrong due to an agency's action to seek judicial review.  *See* 5 U.S.C. § 702.  A court can set aside such an

action if it determines that the agency's findings were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ."  *Id.* § 706.  This is a "highly deferential standard of review," *Sabine River Auth. v. U.S. Dep't of Interior*, 951 F.2d 669, 678 (5th Cir. 1992), but it nonetheless has "serious bite," *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022) (quotation omitted).  In making this determination, courts "review the whole record or those parts of it cited by a party . . . ."  5 U.S.C. § 702.

But the "whole record" is still somewhat limited.  *See Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) ("The record consists of the order involved, any findings or reports on which that order is based, and the pleadings, evidence, and other parts of the proceedings before the agency." (quotation omitted)).  "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985) (alteration in original) (quotation omitted).  This principle is commonly referred to as the "record rule."  *See, e.g., Davis Mountains Trans-Pecos Heritage Ass'n. v. Fed. Aviation Admin.*, 116 F. App'x 3, 12 (5th Cir. 2004).

The administrative record should not be supplemented with extra-record evidence unless "the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency."  *Medina*, 602 F.3d at 706 (quoting *Am. Wildlands v.*

*Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). The Fifth Circuit has articulated three circumstances – the *Medina* exceptions – where supplementation is justified:

> (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, . . .
> (2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or
> (3) the agency failed to explain administrative action so as to frustrate judicial review.

*Id.* (quotation omitted). Some district courts within the Fifth Circuit have recognized eight different exceptions to the record rule.[5] But this Court has historically followed the Fifth Circuit's *Medina* exceptions, *see Harrison Cnty. v. U.S. Army Corps of Eng'rs*, No. 1:19-CV-986-LG-RPM, 2022 WL 2443446, at *3 n.1 (S.D. Miss. July 5, 2022), and finds no reason to depart from that precedent now. Regardless, the three *Medina* exceptions likely encompass the eight additional exceptions. *See La Union del Pueblo Entero*, 141 F. Supp. 3d at 694-95 (S.D. Tex. 2015) ("[T]he Court therefore merely observes that '[m]ost, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina*.'" (quoting *Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:13-CV-126, 2015 WL 1883522, at *3 (S.D. Tex. Apr. 20, 2015)).

---

[5] *See, e.g., La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 141 F. Supp. 3d 681, 694 (S.D. Tex. 2015) ("(1) when agency action is not adequately explained in the record before the court; (2) when looking to determine whether the agency considered all relevant factors; (3) when a record is incomplete; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues; (5) when evidence arising after the agency action shows whether the decision was correct or not; (6) in certain NEPA cases; (7) in preliminary injunction cases; and (8) when an agency acts in bad faith." (quoting *City of Dallas, Tex. v. Hall*, No. CIV.A. 307-CV-0060-P, 2007 WL 3257188, at *5 (N.D. Tex. Oct. 29, 2007)).

## III. DISCUSSION

Plaintiffs maintain that it is appropriate to supplement the administrative record with the Kirk Report for three limited purposes:

[1.] Confirming that the August 2022 Neal-Schaffer [sic] report did not include consideration of additional traffic associated with the commercial development that is a primary purpose of the project.

[2.] Demonstrating that if the modeling had included the traffic that would result from the projected 2.8 million square feet of commercial space[,] intersections at U.S. 49 would be overwhelmed, and those intersections are at the limits of additional capacity.

[3.] Demonstrating that August 2022 Neal-Shaffer [sic] modeling used incorrect assumptions about the operation of turning lanes, which resulted in overestimating the improvements in traffic flow.

Mot. [66] at 2-3 (citations omitted).

A. Whether the Kirk Report Falls within an Exception to the Record Rule

1. The Exception for Complex Cases and Background Information

Plaintiffs contend that the Kirk Report meets the record rule exception for complex cases that require the Court to consider additional evidence to understand the issue,[6] and under the exception for background information necessary for the Court to determine whether the agency considered all relevant factors. *See* Reply [73] at 3; Mem. [67] at 6.

The Court is not persuaded by these arguments. First, Plaintiffs have not explained or proffered any evidence illustrating how the Kirk Report offers new background information not already available in the administrative record. As

---

[6] This exception is not one of the three *Medina* exceptions, but rather one of the eight exceptions some district courts have applied. *See La Union del Pueblo Entero*, 141 F. Supp. 3d at 694. Because this exception is likely subsumed by the *Medina* factors, *see id.*, the Court will analyze it.

9

Plaintiffs stated in their Motion [66], "Dr. Kirk's February 2024 report assesses the August 2022 Neal-Schaffer [sic] study." Mot. [66] at 2. The Kirk Report itself begins by stating "[t]he purpose of this document is to summarize the review of the US 49 Traffic Analysis Report completed by Neel-Schaeffer [sic] . . . ." Ex. [66-1] at 1. A report that simply analyzes another report already in the record, by its very nature, is not introducing new background information. Furthermore, the standard under this element is one of necessity, not relevance. *Harrison Cnty., Mississippi*, 2022 WL 2443446, at *4 (adopting the defendant's argument that the standard is necessity while ruling against the defendant because the plaintiff's expert was in fact necessary); *see also Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 247 (5th Cir. 2006) ("Extra-record evidence may be admitted if *necessary* to determine whether an agency has adequately considered adverse environmental impacts." (emphasis added)). The Kirk Report may be relevant to Plaintiffs' argument; however, it is not necessary to the Court's determination of whether the DOT considered all relevant factors.

Second, Plaintiffs have not explained how the Kirk Report will assist the Court in navigating the technical field of transportation engineering. Plaintiffs cite to *Sierra Club v. National Marine Fisheries Service*, in which the court admitted an extra-record declaration because it helped explain technical information and illustrate "how the agency failed to consider relevant evidence." 711 F. Supp. 3d 522, 541 (D. Md. 2024); Reply [73] at 5. And although the facts of the case are similar, the Court is less persuaded by this non-binding decision than by its former

decision in *Harrison County,* 2022 WL 2443446.  In *Harrison County,* the court permitted plaintiffs to introduce the expert testimony of a fisheries biologist to explain "the effect of spillway operation on essential fish habitats . . . ."  2022 WL 2443446, at *3.  That testimony is distinguishable from the opinion in the Kirk Report.  The Kirk Report is not simply explaining, for instance, the effects of commercial development on traffic patterns in a given area – nor does the Court need it to.  All three of the purposes behind the Kirk Report are ostensibly to attack substantive findings in the Updated Study.  *See* Mot. [66] at 2-3.  Extra-record evidence cannot be introduced to dispute an agency's prior findings.  *See Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980) ("Consideration of [extra-record] evidence to determine the correctness or wisdom of the agency's decision is not permitted, even if the court has also examined the administrative record.").

2.    The Exception for Review of Extra-Record Evidence in NEPA Cases

Plaintiffs also contend that the *Medina* factors are applied more liberally in NEPA cases – a "NEPA exception" to the record rule.  *See* Mem. [67] at 5; Reply [73] at 3; *see also* Resp. [71] at 6 n.3.  While this does not appear to be a stand-alone exception under *Medina,*[7] the Fifth Circuit does recognize some circumstances in which the record rule should be loosened for NEPA cases.  *See Sierra Club v. Peterson*, 185 F.3d 349, 369-70 (5th Cir. 1999) ("[D]eviation from this 'record rule'

---

[7] Although the NEPA exception is one of the eight exceptions enumerated in *La Union del Pueblo Entero*, 141 F. Supp. 3d at 694, not every court recognizes it as a stand-alone exception.  *See Indigenous Peoples of Coastal Bend v. United States Army Corps of Eng'rs*, No. 2:21-CV-00161, 2023 WL 6226387, at *14 (S.D. Tex. July 27, 2023) ("[T]here is no general NEPA exception to the record rule." (citing *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, No. 3:18-CV-00023, 2019 WL 13159731, at *5 (M.D. La. May 14, 2019), *aff'd*, 132 F.4th 872 (5th Cir. 2025)).

occurs with more frequency in the review of agency [NEPA] decisions than in the review of other agency decisions." (internal quotation marks omitted) (quoting *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997)), *vacated*, 228 F.3d 559 (5th Cir. 2000) (en banc); *see also Davis Mountains*, 116 F. App'x at 12; *Sabine River Auth.*, 951 F.2d at 678. As explained in *Sierra Club v. Peterson*, the reason for this is because:

> NEPA imposes a duty on federal agencies to compile a comprehensive analysis of the potential environmental impacts of its proposed action, and review of whether the agency's analysis has satisfied this duty often requires a court to look at evidence outside the administrative record. To limit the judicial inquiry regarding the completeness of the agency record to that record would, *in some circumstances*, make judicial review meaningless and eviscerate the very purposes of NEPA. The omission of technical scientific information is often not obvious from the record itself, and a court may therefore need a plaintiff's aid in calling such omissions to its attention. Thus, we have held that the consideration of extra-record evidence may be appropriate in the NEPA context to enable a reviewing court to determine that the information *available to the decisionmaker* included a complete discussion of environmental effects and alternatives.

185 F.3d at 370 (emphasis added) (quotation omitted).

Although the Court acknowledges Plaintiffs' argument regarding the distinction for NEPA cases, it disagrees that the facts warrant its application here. In *Peterson*, the Forest Service chose to harvest timber without following certain regulations. *Id.* at 370-71. But when it took this action, it never made any record explaining why it had not followed the regulations. *Id.* at 369; 371. Therefore, the district court was tasked with "creating a record where none existed previously." *Id.* at 369. That is notably different from the present case. *See id.* Here, the DOT has established a detailed administrative record that is over 18,000 pages long,

12

spans several years, and includes several traffic studies.  *See generally* R. [17-1] at 1

to -[53-20] at 175; Ex. [64-3] at 1 to -[64-5] at 47 (supplemental administrative

record).  It is not that there is no record; it is that Plaintiffs disagree with it.

Because the NEPA exception should only be applied "in some circumstances,"

*Peterson*, 185 F.3d at 370, and because this case does not fit those circumstances,

the Court is not persuaded by this argument.

Plaintiffs also cite *Davis Mountains* as a basis for admitting the Kirk Report

under the NEPA exception.  Mem. [67] at 5.  In that case, the Fifth Circuit held that

"[t]his court has recognized an exception to the general rule, however, where

examination of extra-record materials is necessary to determine whether an agency

has adequately considered environmental impacts under NEPA."  *Davis Mountains*,

116 F. App'x at 12 (collecting cases).  But, as previously stated, necessity is not the

same as relevance, *see Harrison Cnty.*, 2022 WL 2443446, at *4, and this language

does not open the door for Plaintiffs to insert evidence just to dispute the DOT's

prior findings, *see Davis Mountains,* 116 F. App'x at 16 (admitting expert

declarations that were necessary to determine whether the U.S. Air Force took a

"hard look" at the effects of its airspace plan, but excluding other evidence that was

being introduced simply to present opposing opinions); *Lee v. U.S. Air Force*, 354

F.3d 1229, 1242 (10th Cir. 2004) (affirming the district court's denial of extra-record

evidence in the form of an affidavit that "simply present[ed] an expert opinion

conflicting with the U.S. Air Force's conclusion . . .").

As the court in *Davis Mountains* noted, an agency is "entitled to rely on the reasonable opinions of its own experts . . ." and doing so "does not render its decisions arbitrary and capricious . . . ." 116 F. App'x at 16. In fact, "[w]here an agency's particular technical expertise is involved, [the court is] at [its] most deferential in reviewing the agency's findings." *Medina*, 602 F.3d at 699; *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 185 (2025) ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."). Again, the NEPA exception should not apply to this case.

Even assuming that the NEPA exception did apply, it would still not warrant admitting the Kirk Report. The purpose of the exception is "to enable a reviewing court to determine that the information available to the decisionmaker included a complete discussion of environmental effects and alternatives." *Peterson*, 185 F.3d at 370 (quotation omitted)*; see also Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at *2 ("[B]ecause NEPA calls for a comparative inquiry, deciding whether an agency has sufficiently considered environmental impacts requires some sense of the universe of information that was available for the agency to consider." (citation omitted)); *Louisiana Crawfish Producers Ass'n W. v. Mallard Basin, Inc.*, No. 6:10-CV-1085, 2019 WL 171693, at *5 (W.D. La. Jan. 10, 2019) ("'[E]xceptions to the normal rule regarding consideration of extra-record materials only apply to information available at the time, not post-decisional information.'" (quoting *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130-31 (9th Cir. 2012)).

14

Here, the Final EA was published in September 2022, *see* R. [53-4] at 93, and the Kirk Report was not completed until February 2024, *see* Ex. [66-1] at 1.  It is not possible that the Kirk Report was available to the DOT when it considered the potential environmental effects of and alternatives to the Project.  And although some of the data contained in the Kirk Report was available to the DOT when it made its determination, *see* R. [53-20] at 42-44, the Report, as a whole, is post-decisional, *see Mallard Basin, Inc.*, 2019 WL 171693, at \*6 (holding that a report was post-decisional because it was completed after the last agency decision on the matter and relied heavily on a post-decision site visit and data, some of which was gathered post-decision).  Thus, allowing the Kirk Report to supplement the record now would frustrate the purpose of the NEPA exception.  *See id.* at \*5; *Peterson*, 185 F.3d at 370; *Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at \*2.

B.    Whether the Updated Study Supplemented the Information Already Available for Public Review

In addition to disagreeing with the overall conclusions of the Final Study, Plaintiffs take issue with the fact that it "was prepared after the close of the public comment period, and neither the public or the parties had any opportunity to review or comment on the study before the Final EA and Finding of No Significant Impact were issued . . . ."  Mem. [67] at 3; *see also* Reply [73] at 10.  Plaintiffs claim that the Final Study did not merely supplement existing data, but that it added new material central to the DOT's decision.  Reply [73] at 4.  And because this new, critical information was adopted after the close of public comment, Plaintiffs were prejudiced such that the Court should consider the Kirk Report.  *Id.* at 4-5.

15

Plaintiffs' argument rests primarily on the Ninth Circuit's decision in *Idaho Farm Bureau Federation v. Babbitt*, where that court found error where the Fish and Wildlife Service ("FWS") failed to make available for public comment a study that was "critical" to the agency's determination.  58 F.3d 1392, 1403 (9th Cir. 1995) (quotation omitted); *see also* Reply [73] at 4-5.  The court stated that "an agency may use 'supplementary' data, unavailable during the notice and comment period, that 'expands on and confirms' information contained in the proposed rulemaking and addresses 'alleged deficiencies' in the pre-existing data, so long as no prejudice is shown.'"  *Babbitt,* 58 F.3d at 1402 (cleaned up) (quoting *Solite Corp. v. EPA*, 952 F.2d 473, 484 (D.C. Cir. 1991)); *see also Airlines for Am. v. Dep't of Transportation*, 127 F.4th 563, 580 (5th Cir.) (quoting same), *vacated*, 154 F.4th 323 (5th Cir. 2025) (en banc), *vacated on reh'g*, 166 F.4th 487 (5th Cir. 2026) (en banc).  But the court also observed that "[o]pportunity for public comment is particularly crucial when the accuracy of important material in the record is in question."  *Babbitt*, 58 F.3d at 1403.

While this might be a compelling argument in certain cases, it is inappropriate given the current record.  In *Babbitt*, the FWS posted a proposed listing making a species of spring snail endangered due to declining water flows in their habitat.  *See id.* at 1395.  The FWS referenced several studies verifying that spring flows in the area had decreased, but it offered no data explaining the cause of this decline.  *See id.* at 1402-03.  Then, when identifying the causes of spring flow decrease in its final decision, the FWS relied in large part on a study that was never

16

made available during the public comment period. *See id.* The study was central to the FWS's decision because it "provided the only scientific information" supporting its key analysis. *Id.* at 1403. Had the FWS used the study simply to confirm its prior data indicating that spring flow had decreased, it would have been supplemental. *See id.* But since the study was not merely supplemental, the agency erred in not allowing public comment on it. *See id.* at 1404.

Turning to the case at hand, Appendix B to the Final EA begins by reciting the same data originally published in the Preliminary EA. *See* R. [53-8] at 191-203. It then introduces the Updated Study, which collected new traffic counts and used those counts to perform an updated LOS analysis for both A.M. and P.M. peak hours at the originally studied intersection and three new intersections: U.S. 49 at Landon Road and Crossroads Parkway; U.S. 49 at Creosote Road; and U.S. 49 at Middle Drive. *See id.* at 207.

Although the Updated Study does not perfectly match the findings in the Preliminary EA,[8] it still supports the conclusion of modest overall improvements to traffic flow in the area. It shows, when comparing 2045 projections for the Build versus No-Build alternatives, LOS improvements to three of the four intersections depending on the peak hour of traffic (morning or night), a negative impact to only one intersection, again depending on the peak hour of traffic, and no impacts to

---

[8] Specifically, the Original Study showed that the LOS grade at the intersection of U.S. 49, Poole Street, and Airport Road, was currently a "C" during the peak P.M. hour and would drop to an "F" regardless of whether the Project was built. *See* R. [40-3] at 34; R. [42-3] at 1, 5, 9. The Updated Study showed that the intersection had become a "D" during the peak P.M. hour, would remain a "D" if the Project was built, and would drop to an "E" if nothing was built. R. [53-8] at 219-220. But the Updated Study also prefaced that "some differences are to be expected" due to the updated counts from 2019 to 2022. *See id.* at 210.

another intersection.  *Id.* at 220.  The Updated Study likewise references the GRPC models that show a reduction in average daily traffic on the southern side of the Interchange.  *Id.* at 213, 216.

Both the Preliminary EA and the Final EA found that the Project would alleviate traffic congestion to some degree.  *See* R. [40-3] at 45, 59; R. [53-5] at 40, 54; R. [53-8] at 221.  The Preliminary EA reached this conclusion based on the Original Study that only considered one intersection at one time of day.  *See* R. [40-3] at 34; R. [42-4] at 85 to -[42-3] at 9.  The Final EA confirmed this conclusion based on an Updated Study that expanded on the original traffic analysis.  *See* R. [53-8] at 221; *see generally* R. [53-8] at 190 to -[53-9] at 18.  In other words, the Updated Study supplemented the Original Study.  *Cf. Babbitt*, 58 F.3d at 1402-04.

Furthermore, agencies are permitted to consider additional materials based upon public comments.  *Id.* at 1402 ("An agency can add material to the administrative record after the close of a public comment period when that material is a response to the comments." (citing *Rybachek v. EPA*, 904 F.2d 1276, 1286 (9th Cir. 1990)).  Indeed, this is how the NEPA process is supposed to operate.  *See Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at *6 ("[T]he dialogue between administrative agencies and the public is a two-way street . . . ." (internal quotation marks omitted) (quoting *CTS Corp. v. EPA*, 759 F.3d 52, 65 (D.C. Cir. 2014)).   As Defendants point out, if an agency were required to reopen public comment every time it altered its plans in response to the latest comment phase, "a NEPA review would be never-ending . . . ."  Resp. [71] at 5.

18

C.      Plaintiffs Raised their Objections During the Public Comment Phase

Finally, it is also worth noting that Plaintiffs and Dr. Kirk did actually raise their concerns during the public comment phase of the Project.  Dr. Kirk's resume and his July 2022 report, which was a critique of the Original Study similar to the 2024 Kirk Report now at issue, made it into the administrative record.  *See* R. [53-20] at 41-59; R. [46-5] at 145-57; *see also Gulf Coast Rod Reel v. Patterson*, No. 3:13-CV-126, 2015 WL 10097622, at \*10 (S.D. Tex. Dec. 4, 2015) (noting that the administrative record includes "the challenges to the modeling raised during the notice and comment period . . . ."), *aff'd sub nom. Gulf Coast Rod, Reel & Gun Club, Inc. v. U.S. Army Corps of Eng'rs*, 676 F. App'x 245 (5th Cir. 2017).

Plaintiffs now argue that the Kirk Report is admissible to "show the relevant input factors that are missing or factually incorrect from the 2022 Neel-Schaffer traffic study" and cites to cases in which similar extra-record evidence has been admitted.  Reply [73] at 8; *see Nat'l Marine Fisheries Serv.*, 711 F. Supp. at 543; *Inland Empire Public Lands Council v. United States Forest Service*, 88 F.3d 754, 759 (9th Cir. 1996).  But unlike those cases, the administrative record here already contains a report that adequately highlights the alleged deficiencies.  *See* R. [53-20] at 41-59; R. [46-5] at 145-57.

There are six primary findings in the Kirk Report: (1) 380 acres of wetland could "create up to 2,800,000 s.f. of new retail development," Ex. [66-1] at 1 (internal quotation marks omitted); (2) "this amount of retail development could generate between 78,000 and 92,000 additional trips during a typical weekday," *id.*;

19

(3) the Updated Study "does not account for any additional traffic generated by new development . . . ," *id.*; (4) the Updated Study "overestimates intersection capacity at the study intersections . . . ," *id.*; (5) U.S. 49 "does not have the capacity to accommodate the additional estimated trips generated by projected development . . . ," *id.*; and (6), "[i]ntersections along US 49 are currently 'built-out' . . . , leaving minimal room for capacity improvements . . . ," *id.* at 2.  All of these findings were either explicitly stated in Dr. Kirk's original report, *see* R. [53-20] at 43-44, were already considered by the DOT, *see* R. [53-8] at 219 (finding that the existing intersections "are operating at or near capacity"), or are merely an attack on the DOT's expert methodology, *see, e.g.,* Ex. [66-1] at 5 (Kirk Report section titled "Evaluation of US 49 Traffic Analysis Report Analysis Methodology"); *see also Asarco, Inc.*, 616 F.2d at 1160.

And so, despite Plaintiffs' arguments to the contrary, the Court does not find that the Kirk Report offers a "unique contribution" to the information already contained in the record, *see* Reply [73] at 10 (quotation omitted), and it is therefore disinclined to consider this extra-record evidence, *see Ctr. For Biological Diversity v. U.S. E.P.A.*, 90 F. Supp. 3d 1177, 1198 (W.D. Wash. 2015) (striking extra-record evidence that, in part, was "cumulative of the extensive administrative record already before the court"); *OnPath Fed. Credit Union v. United States Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, No. CV 20-1367, 2021 WL 5769468, at *4 (E.D. La. Dec. 6, 2021) (finding that the "plaintiff [] failed to articulate the unique contribution" of an extra record report that "reach[ed] the same conclusions"

as two other reports by the same expert already in the record"), *aff'd*, 73 F.4th 291 (5th Cir. 2023); *Davis Mountains*, 116 F. App'x at 16 (affirming the district court's decision to exclude evidence that was "largely cumulative of evidence already in the administrative record").

## IV.  CONCLUSION

Plaintiffs argue that "Defendants do not offer any valid argument why the Court cannot consider the Kirk Report."  Reply [73] at 4.  But that is not the correct standard.  As the moving party, Plaintiffs bear the burden of demonstrating circumstances that justify a departure from the presumption of review based solely upon the administrative record.  *See Medina*, 602 F.3d at 706.  They have not done so, and Plaintiffs' Motion [66] should be denied.  To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiffs National Council of Negro Women, the Education, Economics, Environmental, Climate and Health Organization, Healthy Gulf, and the Sierra Club's Motion [66] for Consideration of Extra-Record Evidence is **DENIED**.

**SO ORDERED AND ADJUDGED**, this the 17th day of March, 2026.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE