**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION**

| | | |
|---|---|---|
| NATIONAL COUNCIL OF NEGRO WOMEN, et al. | § § § § | **PLAINTIFFS** |
| v. | § § § | Civil No. 1:22-cv-314-HSO-BWR |
| SEAN DUFFY, *in his official capacity as U.S. Transportation Secretary*, and U.S. DEPARTMENT OF TRANSPORTATION | § § § § § § | **DEFENDANTS** |

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFFS' MOTION [68] FOR SUMMARY JUDGMENT, AFFIRMING THE DECISION OF THE UNITED STATES DEPARTMENT OF TRANSPORATION, AND DISMISSING THE COMPLAINT [1]**

Plaintiffs National Council of Negro Women ("NCNW"), the Education, Economics, Environmental, Climate and Health Organization ("EEECHO"), Healthy Gulf, and the Sierra Club (collectively, "Plaintiffs") seek summary judgment vacating the United States Department of Transportation's (the "DOT") Environmental Assessment and Finding of No Significant Impact with respect to a local road project, and remanding it for preparation of an Environmental Impact Statement, or in the alternative, remanding it for further proceedings. *See* Mot. [68] at 2. The Court finds that this Motion [68] should be denied, that the decision of the DOT should be affirmed, and that the Complaint [1] should be dismissed.

I. BACKGROUND

A.    Legal Framework

The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, is

> a statute drafted to ensure that federal agencies "carefully consider detailed information concerning significant environmental impacts," and at the same time "guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Spiller v. White*, 352 F.3d 235, 237 (5th Cir. 2003) (quoting *Sabine River Authority v. U.S. Dept. of Interior*, 951 F.2d 669, 676 (5th Cir. 1992)).  It is a "strictly procedural statute and does not mandate that [an] agency reach any particular conclusion," *Sierra Club v. Fed. Highway Admin.*, 435 F. App'x 368, 373 (5th Cir. 2011); *see also Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, 605 U.S. 168, 173 (2025), but it does require federal agencies to "take a 'hard look' at" potential environmental consequences before taking "major action," *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983).

42 U.S.C. § 4332(C) and its corresponding regulations create "three classes of actions that prescribe the level of documentation required in the NEPA process."  23 C.F.R. § 771.115.  This tiered system mandates varying degrees of scrutiny by an agency depending on the environmental risks associated with that agency's action. *Id.*  At the highest level is what is commonly known as the Environmental Impact Statement ("EIS").  *Id.*; *Sabine River Auth.*, 951 F.2d at 676.  An EIS is only required where an agency "engages in *major* Federal action *significantly* affecting the environment," *Sabine River Auth.*, 951 F.2d at 676 (emphasis added) (quotation omitted) (cleaned up), and it

> is intended to detail the environmental and economic effects of any proposed federal action so that those not directly involved can understand and give meaningful consideration to and make appropriate comment on the factors involved.  It also ensures that the decisionmaker

give [sic] serious weight to environmental factors in making discretionary choices.

*Id.* at 676-77 (quotation omitted).

Opposite the EIS is the class for Categorical Exclusions ("CEs"). *See* 23 C.F.R. § 771.115(b). These are "[a]ctions that normally do not have a significant environmental effect" and are excluded from further environmental analysis. *Id.* Finally, when an action does not qualify for an EIS or a CE, it falls under the class of Environmental Assessments ("EAs"). *See id.* § 771.115(c).

> The EA is "a rough-cut, low-budget environmental impact statement designed to show whether a full-fledged environmental impact statement—which is very costly and time-consuming to prepare and has been the kiss of death to many a federal project—is necessary." The EA will come to one of two findings: either that the project requires the preparation of an EIS to detail its environmental impact, or that the project will have no significant impact . . . necessitating no further study of the environmental consequences which would ordinarily be explored through an EIS.

*Sabine River Auth.*, 951 F.2d at 677 (citation omitted). "To assist federal agencies in resolving whether they must prepare an EIS, the federal Council on Environmental Quality ("CEQ") has issued regulations" which allow "agencies to make a preliminary [EA] aimed at determining whether the environmental effects of a proposed action are 'significant.'" *Id.* at 677 (internal quotation marks omitted) (quoting *Sierra Club v. Marsh*, 769 F.2d 868, 870 (1st Cir. 1985)).

If an agency issues a Finding of No Significant Impact ("FONSI") based on the findings in the EA, then its task under NEPA is finished – no further review is necessary. *See Sabine River Auth.*, 951 F.2d at 677. However, to reach this conclusion, the EA must, among other things,

3

> (1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; [and]
> (2) Briefly discuss the:
>> (i) Purpose and need for the proposed agency action;
>> (ii) Alternatives as required by . . . NEPA; and
>> (iii) Environmental effects of the proposed action and alternatives . . . .

40 C.F.R. § 1501.5(c);[1] *see also Sierra Club v. Espy*, 38 F.3d 792, 802-03 (5th Cir. 1994).  Ultimately,

> a decision to forego preparation of an EIS may be unreasonable for at least two distinct reasons: (1) the evidence before the court demonstrates that, contrary to the FONSI, the project may have a significant impact on the human environment, or (2) the agency's review was flawed in such a manner that it cannot yet be said whether the project may have a significant impact.

*O'Reilly v. U.S. Army Corps of Eng'rs*, 477 F.3d 225, 239 (5th Cir. 2007) (citation omitted).  "[A]n aggrieved party may challenge the decision in federal court under the Administrative Procedures Act."  *Sabine River Auth.*, 951 F.2d at 677.

B.    Factual Background

The City of Gulfport, Mississippi (the "City" or "Gulfport"), is the second largest city in the State, having doubled in size since 1994.  *See* R. [53-8] at 125.[2] U.S. Highway 49 ("U.S. 49") is a major thoroughfare through the City and has an

---

[1] At all relevant times, the DOT's compliance with NEPA was governed by the regulations promulgated by the CEQ.  *See* 40 C.F.R. §§ 1500.1-1508.1.  The CEQ has since rescinded these regulations, *see* 90 Fed. Reg. 10610 (Feb. 25, 2025), but because they were applied throughout the process before the agency, the Court will apply them here as well, *see Monroe Cnty. Bd. of Commissioners v. United States Forest Serv.*, No. 1:24-CV-01560-TWP-KMB, 2025 WL 2687723, at *14 n.1 (S.D. Ind. Sept. 18, 2025); *Bair v. California Dep't of Transportation*, 982 F.3d 569, 577 n.20 (9th Cir. 2020); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, No. CV 23-110-M-DWM, 2025 WL 3549515, at *2 n.2 (D. Mont. Dec. 11, 2025).

[2] All citations to the administrative record and the parties' briefs are to the page numbers generated by CM/ECF.

4

Average Annual Daily Traffic ("AADT") count of over 50,000 vehicles. *See id.* Interstate 10 ("I-10") runs perpendicular to U.S. 49 and has an AADT of over 60,000 vehicles. *See id.* The interchange where these roads connect (the "Interchange"), located in northern Gulfport, is "arguably the busiest intersection in the region and one of the busiest in the entire State of Mississippi." *Id.*

Southwest of the Interchange are a series of wetlands that are part of the Turkey Creek watershed. *See* R. [37-2] at 103; Mem. [69] at 6. The United States Environmental Protection Agency (the "EPA") has designated these wetlands as aquatic resources of national importance. *See* R. [37-2] at 103. According to the EPA, these wetlands "provide important biological and hydrological functions that assist in the sustenance of the ecological community and the human environment." *Id.* "The wetlands are directly adjacent to or upstream from two historic neighborhoods: the Forest Heights neighborhood, and the Turkey Creek community." Mem. [69] at 6; *see also* R. [53-5] at 84 (map of existing layout). Plaintiffs highlight the historic value of these communities, noting that "[t]he Forest Heights neighborhood was developed in the mid-1960's as a cooperative project of the [NCNW], the U.S. Department of Housing and Urban Development, and the Ford Foundation. It is named Forest Heights as a tribute to Dorothy Height, who was president of the [NCNW] from 1947-1997." Compl. [1] at 2.

In response to the Gulf Coast's rapidly increasing population, *see* R. [53-8] at 89; R. [22-2] at 79, in the fall of 2017, the Mississippi Department of Transportation

(the "MDOT") conducted a Planning and Environmental Linkage ("PEL") study[3]

designed to: "(1) identify the purpose and need for improvements within the I-10/US

49 Interchange area; (2) determine possible viable concepts for long-term solutions;

and (3) recommend concepts for possible implementation," R. [53-5] at 20.  The PEL

study screened thirty potential build concepts and one no-build concept, *see* R. [53-8]

at 90, and ultimately identified several alternatives that it deemed worthy of

further consideration, *see id.* at 102.

After reviewing the PEL study, the City prepared and submitted an

application to the DOT[4] for a 2019 Fiscal Year BUILD grant (the "BUILD Grant") to

receive federal funding for transportation improvements within the City.  *See* R.

[53-5] at 20.  This application, titled "Interconnecting Gulfport," R. [53-8] at 122,

describes a proposed roadway project that is broken down into three legs: an

extension of Daniel Boulevard to a new interchange; an overpass over I-10 that

connects to a road travelling south to a roundabout at Factory Shop Boulevard; and

finally, a road that runs south from the roundabout, curves east, and connects with

Highway 49 at Poole Street.  *See id.* at 126; *see also id.* at 128.  This proposed

---

[3] "A PEL Study represents an approach that fosters a collaborative and integrated transportation decision-making process.  A PEL Study is generally executed early in the transportation planning process when decision-makers consider environmental, community, and economic goals and carry these goals through to the project development and environmental review process, and ultimately through design, construction and maintenance."  R. [53-8] at 86.

[4] At times, the Federal Highway Administration ("FHWA") acted rather than the DOT.  But because the FHWA is a branch of the DOT, *About FHWA*, U.S. DEPT. OF TRANSP., https://highways.dot.gov/about/about-fhwa (last visited March 16, 2026), and because the DOT is named as a Defendant, the Court will refer to the DOT and the FHWA collectively as the "DOT."

roadway project runs just southwest of the Interchange and through the Turkey

Creek watershed.  *See id.* at 128; *see also* Mem. [69] at 6.

In November 2019, the DOT announced the Fiscal Year 2019 Build Grant

recipients, one of which was the "Interconnecting Gulfport" project (the "Project").

*See* R. [53-8] at 172-73.  In its award description, the DOT states:

> The project aligns with the Department's criteria related to safety, and economic competitiveness.  This project will improve commuter, pedestrian, and bicyclist safety . . . .   [It] will reduce congestion, will provide additional access to public right-of-way in the city's least restrictive commercial zone, and will supplement the city's regional economic competitiveness . . . .
>
> Although the Economic Analysis team found with high confidence that the costs of the project are likely to exceed its benefits, the project highlights pedestrian and bicycle accessibility, and includes access that is more reliable, safer, and, in some cases, quicker than was is [sic] currently provided, while modestly decreasing transportation costs to consumers and employees . . . .  Based on these benefits, the Department is confident that the project will advance BUILD program goals.

*Id.*

Because the Project was set to receive federal funding through the BUILD

Grant, NEPA was triggered.  *See* Resp. [72] at 12; *see also, e.g., Indian Lookout All.*

*v. Volpe*, 484 F.2d 11, 16 (8th Cir. 1973) ("[A]ny project for which federal funds have

been approved or committed constitutes a major federal action bringing into play

the requirements of NEPA.").  Therefore, in June 2022, the MDOT, in coordination

with the DOT, published a Preliminary Environmental Assessment (the

"Preliminary EA").  *See* R. [40-3] at 7.  It defined the purpose and need of the

Project as "to improve the flow of vehicular traffic around the Interstate 10 and US

49 Interchange," "to address local and through traffic that is plagued with delayed

movement," "to serve the area's commercial growth," and to "consider[] safety concerns . . . ." *Id.* at 29.

The Preliminary EA considered several roadway alternatives that could potentially meet this purpose and need. *See id.* at 30-55. Specifically, it identified three different alternatives to advance for further study: Alternative A, Alternative B, and Alternative C. *See id.* at 34. Alternative A was the No Build Alternative which, as the name implies, considered the implications if the Project location "retain[ed] the existing conditions." *Id.* at 38. Alternative B was the alternative described in the BUILD grant application, *see id.* at 34-37; R. [53-8] at 126, and Alternative C was a design similar to Alternative B, but with some adjustments to help minimize the negative constraints that were identified in Alternative B, *see* R. [40-3] at 37; *compare* R. [40-3] at 40 (map of Alternative C's roadway alignment), *with* R. [40-3] at 36 (map of Alternative B's roadway alignment).

The Preliminary EA found that "Alternative C addresses the project needs and objectives as well as the constraints which resulted in Alternative B being eliminated. Alternative C is the most viable build alternative. Therefore, it is the Preferred Alternative for this study." *Id.* at 45. The road design for Alternative C

> begins on Poole Street at the eastern limit of a reconstructed intersection with Old US 49 . . . . [It] continues west . . . along the Poole Street corridor a short distance before starting a slight reverse curve to the north near the centerline of Old US 49 . . . . Alternative C then curves to the north and upon completing the curve crosses the [Kansas City Southern ("KCS")] spur line . . . . North of the spur line crossing, a roundabout is proposed where Alternative C intersects a southwest extension of the two-lane divided Factory Shop Boulevard . . . . [As Alternative C] continues northwest from the roundabout, [it] . . . makes a bridged crossing over I-10 . . . and terminates at a roundabout

> intersection . . . . The other two roads intersecting opposite each other at the roundabout are a relocated lighted section of the Canal I-10 Service Road . . . and a lighted extension of the four-lane divided Daniel Boulevard . . . .  34th Avenue would form a short tie-in north side road intersection [sic] with the extension of Daniel Boulevard slightly east of the roundabout.

*Id.* at 41, 45; *see also id.* at 40.  Like the original road design in the BUILD Grant application, Alternative C cuts through the Turkey Creek watershed.  *See id.* at 40; Mem. [69] at 6.

The Preliminary EA was introduced for public comment over the following months, and a public meeting was held on the matter.  *See* R. [46-2] at 20; R. [53-20] at 1; *see generally* R. [53-16] at 26 (Appendix J to the Final EA, cataloging public hearings and comments on the Project).  Then, in the fall of 2022, the DOT approved the Final Environmental Assessment ("Final EA").  *See* R. [53-4] at 93.

The Final EA reflects several modifications made by the MDOT and DOT in response to the public comment period.  *See* Resp. [72] at 13.  Notably, it includes an updated traffic study, provides information regarding mitigation, and revises the Purpose and Need section for the Project.  *See id.*  For instance, the Purpose and Need section now states that "*a* purpose of this project is to provide transportation infrastructure that will improve the flow of vehicular traffic around the Interstate 10 and US 49 Interchange and that will encourage existing and support new commercial and economic growth."  R. [53-5] at 23 (emphasis added).  Additionally, Alternative C remained the preferred alternative, with the general layout of the roadway remaining unchanged.  *See id.* at 36, 40.  But, most importantly, the Final EA includes a FONSI, stating that "[t]he Federal Highway Administration has

determined that this project's Proposed Action and the selected Alternative C, as described in the project's Environmental Assessment, will have no significant impact on the human or natural environment." R. [53-4] at 94 (italics omitted). Therefore, according to the DOT, its obligations under NEPA were satisfied. *See* Resp. [72] at 16.

C.    Procedural History

On November 17, 2022, Plaintiffs filed this lawsuit under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701, *et seq.*, against the DOT and Secretary of Transportation Peter Buttigieg in his official capacity,[5] claiming several violations of NEPA, 42 U.S.C. §§ 4321, *et seq. See* Compl. [1] at 13-21.  Plaintiffs allege that the DOT violated NEPA when it: (1) issued the BUILD Grant without preparing an EIS, *see id.* at 18-19; (2) failed to adequately consider the direct, indirect, and cumulative impacts of its decision to approve the Project, *see id.* at 19-20; (3) did not consider reasonable alternatives to the Project, *see id.* at 20-21; and (4) failed to provide information supporting the claims in the Final EA, *see id.* at 21.  Plaintiffs ask the Court to declare that the DOT violated NEPA, vacate the DOT's decision, order it to prepare an EIS, and issue any injunctions necessary to prevent irreversible harm to the wetlands endangered by the Project. *See id.* at 22. Plaintiffs also seek attorneys' fees and other relief. *See id.*

---

[5] Pursuant to Federal Rule of Civil Procedure 25(d), current Secretary of Transportation Sean Duffy is automatically substituted for his predecessor and originally named defendant, Peter Buttigieg. *See* Fed. R. Civ. P. 25(d).  This substitution was formalized on March 17, 2026. *See* Text Only Order entered March 17, 2026.

On October 18, 2024, Plaintiffs filed their Motion [68] for Summary Judgment, arguing that the Final EA and FONSI "should be vacated and the matter remanded for preparation of an [EIS]; or in the alternative vacated and remanded for further proceedings," and that funding for the Project should be enjoined as necessary.  Mot. [68] at 2.  To that end, Plaintiffs argue that the DOT failed to evaluate the reasonably foreseeable impacts of induced development, *see* Mem. [69] at 15, failed to evaluate reasonable alternatives outside the City's jurisdiction, *id.* at 22, arbitrarily and capriciously concluded that the Project will relieve traffic congestion, *id.* at 26, and arbitrarily and capriciously issued the FONSI because there is no information in the record explaining how wetlands and streams will be properly mitigated, *id.* at 31; *see also* Mot. [68] at 1-2; Reply [74].

## II. STANDING

Standing is a threshold jurisdictional question, *see Vermont Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000), that "springs from the nature of limits of the judicial power of the United States and is inflexible and without exception," *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998) (quotations omitted) (cleaned up). "The question of standing involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quotation omitted). Plaintiffs contend, and Defendants do not dispute, that they have standing under Article III of the Constitution.  *See* Mem. [69] at 8-10; *see generally* Resp. [72].  But,

regardless, the Court must conduct its own inquiry.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009).

A.      Plaintiffs NCNW, Healthy Gulf, and Sierra Club

Plaintiffs NCNW, Healthy Gulf, and Sierra Club argue that they have associational standing, *see* Mem. [69] at 13, which requires that "(1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members."  *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006) (citing *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

1.      Injury in Fact, Causation, and Redressability

The first element of associational standing only requires that one member of a plaintiff association satisfy Article III standing requirements.  *See, e.g., Harrison Cnty. v. U.S. Army Corps of Eng'rs*, 651 F. Supp. 3d 843, 852 (S.D. Miss. 2023) ("[I]t is only necessary for one [p]laintiff or one member of a [p]laintiff association to establish standing."); *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirements.").  Article III standing requires that:

> First, the plaintiff must have suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of

some third party not before the court.  Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations and quotations omitted) (cleaned up).

Here, Plaintiffs submitted a Declaration from Katherine Egland ("Ms. Egland" or "Declarant"), who is "a life member" of both the NCNW and Sierra Club, and is "also a member and a board of directors member of Healthy Gulf."  Decl. [68-1] at 2.  She testified that

> Turkey Creek is centrally important to me as a person.  I have been visiting Turkey Creek and the community that surrounds it regularly for 30 years.  Today I visit Turkey Creek and the wetlands along it an average of once a month . . . . Part of my mission at EEECHO is to raise awareness about the importance of protecting Turkey Creek, which is why I take others on tours and invite them to join me on my visits to Turkey Creek.  I intend to continue visiting Turkey Creek and the Forest Heights community at least monthly for as long as my old body lets me.

*Id.* at 3-4.  She claims that the DOT's "inadequate consideration of the impacts of the project and failure to consider better alternatives" will directly harm her.  *Id.* at 1.

Declarant's current use of the land at issue and her concrete plans to return to the area in the future satisfy the "injury in fact" element of Article III standing. *See Sabine River Auth.*, 951 F.2d at 674 ("The procedural injury implicit in agency failure to prepare an EIS—the creation of a risk that serious environmental impacts will be overlooked—is itself a sufficient 'injury in fact' to support standing, provided this injury is alleged by a plaintiff having a sufficient geographical nexus to the site of the challenged project . . . ." (quotation omitted)).

The Declaration is likewise sufficient to satisfy Article III standing with respect to causation and redressability. "When a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. E.P.A.*, 549 U.S. 497, 518 (2007). Because Ms. Egland claims that the DOT failed to comply with the procedural requirements of NEPA – namely, failure to perform an EIS, *see generally* Decl. [68-1] – the first element of associational standing is satisfied, *see Massachusetts*, 549 U.S. at 518; *Lujan*, 504 U.S. at 560-61; *Sabine River Auth.*, 951 F.2d at 674.

2.    The Interests Sought to be Protected

The interests Plaintiffs seek to protect are undoubtedly germane to their respective organizations. *See Texas Democratic Party*, 459 F.3d at 587-88. As Declarant stated, "[Healthy Gulf's] mission is to unite and empower people in protecting and restoring the Gulf Region's natural resources, including the Turkey Creek watershed," Decl. [68-1] at 2, and the "[Sierra Club] is the country's largest and oldest environmental non-profit organization. Broadly speaking, its mission is to explore, enjoy, and protect the wild places of the earth . . . ," *id.* at 3. Additionally, Declarant also testified to the role that the NCNW, and its former president, Dr. Height, played in establishing Forest Heights, and how, as a member of the NCNW, she still works with many of its residents. *See id.* at 4-5.

3.    Participation of Individual Members

As to the third element of associational standing, nothing requires the participation of Ms. Egland herself.  *See Texas Democratic Party*, 459 F.3d at 588. Her interests are adequately represented by Plaintiffs, and the relief sought "will inure to [her] benefit."  *See id.*  Plaintiffs NCNW, Healthy Gulf, and Sierra Club satisfy the requirements for associational standing and can sue on Ms. Egland's behalf.

B.    Plaintiff EEECHO

It is less clear whether EEECHO has associational standing because Ms. Egland testified that it "does not have individuals as members . . . ."  Decl. [68-1] at 2.  But Ms. Egland also testified that she is the "Deputy Executive Director and Co-founder" of EEECHO.  *Id.*  Such a position may qualify her as a constituent who "possess[es] all of the indicia of membership in [the] organization."  *Hunt*, 432 U.S. at 344-45 (finding that individuals who were not traditional "members" of a commission still satisfied associational standing because they alone elected members of the commission, they alone served on the commission, and they alone financed the commission's activities); *see also Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828-29 (5th Cir. 1997) (citing *Hunt* and finding that a corporation that has no members under state law may still qualify for associational standing).

Regardless, Plaintiffs allege, and the Court finds, that EEECHO has organizational standing.  *See* Mem. [69] at 9-10.  An "organization can establish

15

standing in its own name if it meets the same standing test that applies to

individuals." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 610 (5th Cir. 2017)

(quotation omitted). Ms. Egland stated that EEECHO "sponsors outdoor education

trips to Turkey Creek for students and the City's residents with the objective of

teaching them about the unique value of Turkey Creek's ecosystem." Decl. [68-1] at

4. Furthermore, she alleges that EEECHO has a direct interest in this case because

its

> office is located on Creosote Road in the Turkey Creek community
> downstream from the area that is directly protected by the wetlands that
> would be destroyed by the Airport Extension Road and the commercial
> development it is intended to bring. The increase in flooding potential
> from this project and development will affect EEECHO as an
> organization and put its office at greater risk.

*Id.* at 8.

For the same reasons discussed with respect to Article III standing for the

NCNW, Healthy Gulf, and Sierra Club, the Court is satisfied that EEECHO has

organizational standing in this case. *See Lujan*, 504 U.S. at 560-61; *Massachusetts*,

549 U.S. at 518; *OCA-Greater Houston*, 867 F.3d at 610; *Sabine River Auth.*, 951

F.2d at 674.

### III. STANDARD OF REVIEW

A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is

appropriate "if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). To rebut a motion for summary judgment, the opposing party must

show, with "significant probative evidence," that there exists a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000). In deciding whether summary judgment is appropriate, the Court views facts and inferences in the "light most favorable to the non-moving party." *Crose v. Humana Ins. Co.*, 823 F.3d 344, 347 (5th Cir. 2016). However, if the evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Cutting Underwater Techs. USA, Inc. v. ENI U.S. Operating Co.*, 671 F.3d 512, 517 (5th Cir. 2012) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).

B.      Standard of Review under NEPA

Under the APA, a reviewing court will set aside an agency's action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C. § 706. Agency action is arbitrary and capricious only

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Fath v. Tex. Dep't of Transp.*, 924 F.3d 132, 136 (5th Cir. 2018) (per curiam) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

This "highly deferential standard" of review affords a court "the least latitude in finding grounds for reversal." *Spiller*, 352 F.3d at 240 (quotations omitted); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185 ("The bedrock principle of judicial review in NEPA cases can be stated in a word:

17

Deference.").  But it still has "serious bite."  *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 856 (5th Cir. 2022) (quotation omitted).  A court must "studiously review the record," *Sabine River Auth.*, 951 F.2d at 678, and determine whether an agency took a "hard look" at the environmental consequences of its action, *Spiller*, 352 F.3d at 240 (quotation omitted).

## IV. DISCUSSION

A.   Reasonably Foreseeable Impacts of Induced Development

Plaintiffs contend that the DOT failed to adequately consider the indirect and cumulative effects of induced development spurred by the Project, stating that

> a, if not the, primary purpose of this road project is to bring about up to 380 acres and 2.8 million square feet of commercial real estate development in an area of undeveloped wetlands . . . .  The expected and intended aggressive development will result in an increase in impermeable surfaces, destruction of wildlife habitat, [and] increases in traffic and other impacts.  Despite this fact, the EA contains only vague and conclusory statements about this development and its impacts.  As a consequence, the agency has failed to consider an important aspect of the problem, and its analysis does not show a rational connection between the facts found and the conclusions drawn.

Mem. [69] at 18.

As a general rule, there are three types of environmental impacts that an EA must assess: direct effects, indirect effects,[6] and cumulative effects.  *See* 40 C.F.R. § 1508.1(i); *see also Gulf Coast Rod, Reel & Gun Club, Inc. v. United States Army Corps of Eng'rs*, 676 F. App'x 245, 249 (5th Cir. 2017) (per curiam).  Indirect effects

---

[6] "Indirect" effects are also sometimes referred to as "secondary" effects.  *See City of Davis v. Coleman*, 521 F.2d 661, 680 (9th Cir. 1975); *see also* R. [53-5] at 163.

18

"are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable.  Indirect effects may include growth-inducing effects and other effects related to induced changes in the pattern of land use . . . ." 40 C.F.R. § 1508.1(i)(2).  And cumulative effects are "effects on the environment that result from the incremental effects of the action when added to the effects of other past, present, and reasonably foreseeable actions . . . ."  *Id.* § 1508.1(i)(3).[7]

However, "'[r]easonable foreseeability' does not include 'highly speculative harms' that 'distort the decisionmaking process' by emphasizing consequences beyond those of 'greatest concern to the public and of greatest relevance to the agency's decision.'"  *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005) (cleaned up) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 356 (1989)). This is an objective standard: "[a]n impact is 'reasonably foreseeable' if it is sufficiently likely to occur that a person of ordinary prudence would take it into account in reaching a decision."  *Id.* (quotation omitted).

1.    Induced Development Findings in the Final EA

As an initial matter, the Final EA did discuss potential indirect and cumulative impacts related to future development.  In the section titled Secondary and Cumulative Effects, *see* R. [53-5] at 163-66, the Final EA found that the indirect impacts of the Project "would mainly be the result of induced development that would be encouraged by construction of Preferred Alternative C,"  *id.* at 164.  It

---

[7] Cumulative and indirect impacts often overlap.  *See Fritiofson v. Alexander*, 772 F.2d 1225, 1246 (5th Cir. 1985) ("[A]n impact can be cumulative and at the same time [be] a direct or indirect impact." (quotation omitted)), *abrogated by Sabine River Auth.*, 951 F.2d 669.

19

found that this induced development would have both positive and negative impacts on the subject area. *See id.* at 163-66. "Based on the existing and projected traffic data . . . the Preferred Alternative C removal of some local traffic from US 49 would be a long-term safety benefit." *Id.* at 165. Additionally, "cumulative impacts on socioeconomics from constructing Preferred Alternative C would be expected to be beneficial. [It] would enhance in the [sic] undeveloped areas due to better accessibility." *Id.* The Final EA also recognized that future development would have incremental adverse impacts on drainage in the area due to increases in impervious surfaces. *See id.*

But the issue really lies with a statement in the Secondary and Cumulative Effects section in which the Final EA states that, if development continues into the future, the "[l]ong-term, indirect cumulative effects would continue to occur. However, these effects, both beneficial and adverse, are difficult, if not impossible, to quantify." *Id.* at 166.

2.    Indirect Impacts

Plaintiffs cite to two cases when arguing that, because "the stated primary purpose of the [Project] is to stimulate economic growth and commercial activity," Mem. [69] at 19, the DOT cannot claim that the effects of such induced development are too speculative to fully assess, *id.* at 18-19. In *City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975), the Ninth Circuit Court of Appeals rejected an agency's position that the effects of future development induced by a roadway project were too speculative because "[t]he growth-inducing effects of the [roadway] project

20

[were] its raison d'etre . . . ." 521 F.2d 661, 675, 676 (9th Cir. 1975). Likewise, the court in *Friends of the Earth, Inc. v. U.S. Army Corps of Engineers*, 109 F. Supp. 2d 30 (D.D.C. 2000), rejected a similar rationale when the administrative record "firmly establishe[d]" that increased growth in the area was "the only reasonable prediction" if the projects at issue were built out. 109 F. Supp. 2d 30, 41 (D.D.C. 2000).

There are several distinguishing factors between those cases and the current Project. First, Plaintiffs cherry-pick quotes from the administrative record to conclude that "*a*, if not *the*, primary purpose" of the Project is to promote economic development in the Turkey Creek area. Mem. [69] at 18 (emphasis added); *see also id.* at 15-16, 19, 22. Yet, after reviewing the administrative record, it is clear that there are several purposes behind the Project, and economic development is only one of them.

As far back as 2017, the PEL study – the study that initiated the whole Project – stated that the needs driving its research were to "[i]mprove mobility along US 49," and to "[i]mprove safety on US 49 and at the I-10 ramps . . . ." R. [53-8] at 89. Later, the BUILD Grant application listed several purposes of the Project, such as decongesting overloaded traffic routes around the Interchange, *see id.* at 127, "commuter, pedestrian, and cyclist safety," *id.* at 132, and supporting new commercial and economic growth, *see id.* at 133. And, similarly, the Final EA identifies several objectives, including reducing congestion along the Interchange,

21

encouraging existing and supporting new economic growth, and improving commuter and pedestrian safety.  *See* R. [53-5] at 23.

There are also other important distinctions between the cases cited by Plaintiffs and the current Project.  In *Davis*, the defendants determined that there was no need to prepare an EIS for their roadway project based only on a three-page "Negative Declaration of Environmental Impact."  *City of Davis*, 521 F.2d at 669. The court described this review as "fairly . . . cursory" and questioned the entire process behind the project's funding because the defendants never held a public hearing on the matter as required by statute.  *Id.* at 669-70, 670 n.10.

And in *Friends of the Earth*, the United States Army Corps of Engineers (the "Corps") was tasked with conducting a NEPA review of three different casino projects whose development would impact navigable waterways.  *See Friends of the Earth, Inc.*, 109 F. Supp. 2d at 32-33.  In its EA, the Corps provided a "total lack of analysis of the growth-inducing effects of the casino projects" and argued that such an analysis was not required because the effects were too speculative.  *Id.* at 41. The court found that "increased growth in the area [was] the only reasonable prediction of what [would] occur if the casinos [were] built," *id.*, and statements in the administrative record to the contrary were "classic example[s] of understatement[s]," *id.*

With these distinctions in mind, the DOT's review of future development here did consider at a basic level the indirect effects of future development.  *See* R. [53-5] at 163-66.  But induced development was just one of the purposes of the Project.

*See, e.g., id.* at 23.  Because this induced development is not the "raison d' etre" of the Project, it was not arbitrary and capricious to conclude that further analysis of such development would be too speculative.  *Cf. City of Davis*, 521 F.2d at 675-76; *Friends of the Earth, Inc.*, 109 F. Supp. 2d at 41.  Moreover, the DOT articulated its impact findings in a Final EA that was 228 pages long, and over 2,500 pages including appendices, *see generally* R. [53-4] at 92, to- [53-20] at 87, and which was prepared after public comment and meetings, *see* R. [53-16] at 78; R. [53-17] at 60; R. [53-18] at 113; R. [53-20] at 1; *see generally* R. [53-16] at 26 (Appendix J).

Plaintiffs also cite the Fifth Circuit decision in *Sierra Club v. Federal Highway Administration*, 435 F. App'x 368 (5th Cir. 2011), which held that "[d]evelopment induced by the construction of a new highway is a secondary effect that must be considered in the EIS for the proposed highway."  435 F. App'x 368, 375 (5th Cir. 2011).  But *Sierra Club v. Federal Highway Administration* was discussing an agency's obligations under an *EIS*, not an *EA.  Id.*  Because the question here is whether the DOT fulfilled its obligations under an EA, *Sierra Club v. Federal Highway Administration* is better read in conjunction with another Fifth Circuit case, *Sierra Club v. Espy*, which reiterated that "[a]n EA is a rough-cut, low-budget environmental impact statement" that must include "brief discussions of . . . the environmental impacts of the proposed action . . . ."  *Espy*, 38 F.3d at 802-03 (quotations omitted).

As previously stated, the Final EA considers future impacts for multiple pages before concluding that further analysis would be too speculative.  *See* R. [53-

23

5] at 163-66.  This is in keeping with Fifth Circuit precedent and it satisfies NEPA requirements for an EA.  *See Espy*, 38 F.3d at 802-03; *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88.

3.     Cumulative Impacts

a.     The Scope of the Cumulative Impact Statement

As a general rule, a "full cumulative impact analysis" is not required when an agency "does not expect a project to have any significant environmental impact that can 'accumulate' with the impacts of other actions." *Fath*, 924 F.3d at 139.  "[A] finding of no incremental impact relieves an agency of the necessity of extensive and ultimately uninformative discussion of cumulative effects pursuant to [NEPA]." *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 894 F.3d 692, 704 (5th Cir. 2018) (collecting cases); *Indigenous Peoples of Coastal Bend v. U.S. Army Corps of Eng'rs*, 132 F.4th 872, 887-88 (5th Cir. 2025) (same); *O'Reilly v. All State Fin. Co.*, No. 22-30608, 2023 WL 6635070, at *6 (5th Cir. Oct. 12, 2023) (per curiam) (same); *see also Fath*, 924 F.3d at 140.

Here, a full cumulative impact analysis was not required.  Although the Final EA notes that cumulative impacts will "continue to occur" should development continue in the area, R. [53-5] at 165-66, the DOT ultimately concluded that the Project would have no significant impact on the environment, *see* R. [53-4] at 94.  As the Court will discuss later, *see* discussion *infra* Section IV.D, this decision was not arbitrary or capricious.  And as the Fifth Circuit has noted, "[i]f the project would have no significant impact by itself, it is unlikely to change the environmental

24

status quo when 'added' to other actions." *Fath*, 924 F.3d at 140 (collecting cases).

But the question still remains whether the discussion of the cumulative impacts in

the Final EA satisfies the general requirements of an EA. *See Gulf Coast Rod, Reel*

*& Gun Club, Inc.*, 676 F. App'x at 249; 40 C.F.R. § 1501.5(c).

To answer this question, Plaintiffs cite to the Fifth Circuit's decision in

*Fritiofson v. Alexander*. *See* Mem. [69] at 12, 19-20; Reply [74] at 4. *Fritiofson* held

that "when deciding the potential significance of a single proposed action (i.e.,

whether to prepare an EIS at all), a broader analysis of cumulative impacts is

required." *Fritiofson*, 772 F.2d at 1243. This study must identify:

> (1) the area in which effects of the proposed project will be felt; (2) the impacts that are expected in that area from the proposed project; (3) other actions—past, proposed, and reasonably foreseeable—that have had or are expected to have impacts in the same area; (4) the impacts or expected impacts from these other actions; and (5) the overall impact that can be expected if the individual impacts are allowed to accumulate.

*Id.* at 1245 (citing *Cabinet Mountains Wilderness/Scotchman's Peak Grizzly Bears*

*v. Peterson*, 685 F.2d 678, 683-84 (D.C. Cir. 1982)).

But in considering *Fritiofson*, the court in *Fath* did not apply this more rigid

formula and instead focused on *Fritiofson*'s more flexible language that "the extent

of a cumulative impact analysis will necessarily depend on the scope of the area in

which the impacts from the proposed action will be felt and the extent of other

activity in that area." *Fath*, 924 F.3d at 140 (quotation omitted) (cleaned up). And

based on the project's limited scope, location over busy urban intersections, and "its

finding that the project will have no significant direct or indirect impact," the court in *Fath* held that the cumulative impact analysis was appropriately limited.  *Id.*

Here, the Final EA's cumulative impact analysis is sufficient.  As previously stated, the DOT found that the Project will have no significant impact on the environment.  *See* R. [53-4] at 94.  And the scope of the Project is arguably more limited than that in *Fath*.  *Compare* R. [53-8] at 123, 126 (BUILD Grant application describing the Project as roughly two miles of new roadway with one overpass), *with Fath*, 924 F.3d at 135 (reviewing three highway projects that included an overpass and twelve total miles of highway alternations).

*Fath* is the more relevant case in determining the scope of the cumulative impact analysis here than *Fritiofson*.  The Fifth Circuit emphasized that *Fritiofson* was "undoubtedly an unusual case," due to "the unique and fragile nature of wetland areas . . . ."  *Fritiofson*, 772 F.2d at 1246; *see also Fath*, 924 F.3d at 140 (same).  Of note, the project area arguably constituted the "largest natural fresh marsh complex remaining on Galveston Island," contained "[i]mportant marsh grasses" and a "rare coastal woodlot," and housed a Native American archeological site.  *Fritiofson*, 772 F.2d at 1227-28.[8]  In fact, the court repeatedly stated that its holding was not "suggest[ing] that the consideration of cumulative impacts at the

---

[8] In comparison, Appendix I to the Final EA includes conversations with the United States Fish and Wildlife Service in which it found that although the Project site was "within the range of several federally listed species," R. [53-15] at 56, none were present in the survey information it reviewed, *id.* at 81; *see also* R. [53-5] at 151-52.  Additionally, the Final EA concluded that "[n]o unique or sensitive vegetation communities" were within the Project's alignment.  R. [53-5] at 143.  Appendix I also includes records of communications with Native American tribes and governmental agencies, in which the consensus was that no Native American sites or other historical properties would likely be affected by the Project.  *See* R. [53-15] at 75-78, 95; *see generally* R. [53-15] at 31 to -[53-16] at 25 (Appendix I: Governmental Agency and Native American Tribe Correspondence).

threshold stage will necessarily involve extensive study or analysis of the impacts of other actions."  *Id.* at 1246; *see also id.* at 1245 n.15 ("Obviously, we are not suggesting that at this stage of the process a full-blown environmental analysis of the impacts of other actions . . . is necessary."); *id.* at 1236 ("[A]n EA should not normally exceed 15 pages . . . ." (quotations omitted)).

b.       Reasonable Impacts versus Highly Speculative Impacts

Similar to indirect effects, cumulative effects must account for "reasonably foreseeable actions."  40 C.F.R. § 1508.1(i)(3).  "Reasonable forecasting and speculation is [] implicit in NEPA, and [the court] must reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'"  *Fritiofson*, 772 F.2d at 1244 (quoting *Sierra Club v. Sigler*, 695 F.2d 957, 970 (5th Cir. 1983)).  Despite this "crystal ball" language, *id.*, the Fifth Circuit has maintained that an EA need not consider highly speculative cumulative impacts, *see, e.g., City of Shoreacres*, 420 F.3d at 453; *O'Reilly*, 2023 WL 6635070, at *7-8 (agreeing with plaintiffs that the Corps failed to conduct an adequate cumulative impact study while rejecting plaintiffs' argument that the Corps had to consider future actions that it found were not reasonably foreseeable).

In response to a public comment on future development documented in Appendix J, the Final EA notes that:

> As with any transportation project on new location or improvement of existing route, the opportunity for some development is provided or at least enhanced.  However, the degree of development is dependent on many factors, economics, ecology, land use limitations, demand,

27

> ordinances, permits, and so forth.  It would be speculative to arrive at the precise acreage that could be induced form [sic] the proposed project . . . .  For a transportation project in a somewhat undeveloped area such as this proposed project, induced development can occur at any location where access is allowed along the roadway.  However, induced development for this project will be controlled by the City of Gulfport zoning, adjacent floodplain, adjacent wetlands, and City of Gulfport floodplain ordnances for development.

R. [53-20] at 82.  Plaintiffs argue that this is an admission that the DOT shirked its duty to conduct its own independent analysis on future impacts and instead relied on other permitting bodies to address the impacts of the Project.  *See* Mem. [69] at 20-21.

The issue of future effects in this case is comparable to that in *Gulf Restoration Network v. U.S. Department of Transportation*, 452 F.3d 362 (5th Cir. 2006), and in the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025).  In *Gulf Restoration Network*, the Secretary of Transportation (the "Secretary") granted a license for a company to operate a deepwater port off the coast of Louisiana.  *Id.* at 365-67.  At the time the final EIS was submitted, there were five other similar applications pending, but the Secretary only considered the cumulative impacts of two of those projects.  *Id.* at 366-67.  The Secretary argued that "a line must be drawn somewhere," and he drew it such that only projects that themselves had released draft EISs were considered.  *Id.* at 369.  His rationale, which the Fifth Circuit affirmed, was that, if he did otherwise, he would have been engaging in "layers of speculation."  *Id.* at 370 (internal quotation marks omitted).

And in *Seven County Infrastructure Coalition*, the United States Surface Transportation Board (the "Board") prepared an EIS for an 88-mile railroad line project that "would provide oil producers a more efficient option for transporting oil out of the Basin to refineries." 605 U.S. at 174-75. The EIS "noted, but did not fully analyze, the potential effects of increased" drilling in the area. *Id.* at 175. It explained that further analysis of these effects was not needed because "the project at issue was an 88-mile railroad line, not an oil well or a drilling permit," *id.*, "the Board possesse[d] no authority or control over potential future oil and gas development," *id.* (internal quotation marks omitted), and future oil and gas development were "'speculative' and attenuated from the project at hand," *id.* at 176. The Court of Appeals for the D.C. Circuit vacated the Board's EIS and final approval because it failed "to address the environmental effects of projects separate in time or place from the construction and operation of the [project under review]." *Id.* at 174.

In reversing the D.C. Circuit's decision, the Supreme Court remarked that "NEPA has transformed from a modest procedural requirement into a blunt and haphazard tool employed by project opponents (who may not always be entirely motivated by concern for the environment) to try to stop or at least slow down new infrastructure and construction projects." *Id.* at 183. It held that the Board's determination that future oil drilling projects were separate from the current railroad project – and therefore should not be considered in the EIS – complied with NEPA, *id.* at 186, and that

29

> if the project at issue might lead to the construction or increased use *of a separate project*—for example, a housing development that might someday be built near a highway—the agency need not consider the environmental effects *of that separate project*. To put it in legal terms, the separate project breaks the chain of proximate causation between the project at hand and the environmental effects of the separate project.

*Id.* at 187 (emphasis in original).

So too here, any future development would amount to a "separate project." *See id.* Although the DOT estimated that the roadway Project would prime approximately 380 acres of wetlands for development and could create up to 2,800,000 square feet of commercial development, *see* R. [53-8] at 134, it found that no other major projects are currently pending in the area, *see* R. [53-5] at 164, and the Project itself does not propose any. Indeed, the Project at hand is a roadway, not a commercial development. *See id.* at 33, 35-36; *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 175. And similar to a housing development brought on by a new highway, future development here would break the causal chain between the effects of the current Project and those of future development. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88. In accordance with NEPA, the Final EA "noted, but did not fully analyze," the potential effects of separate, future development induced by the Project. *Id.* at 175; R. [53-5] at 163-66.

Furthermore, estimates of future development accurate enough to conduct a more thorough cumulative impact study would involve "layers of speculation" that would detract from the accuracy of the decision-making process. *See Gulf Restoration Network*, 452 F.3d at 369-70. Any new developments will naturally have to go through their own permitting and approval processes, and these projects

could be denied or have a variety of conditions imposed upon them that alter their environmental effects. *Id.* at 370 (listing the uncertainty of licensing approval as one of the layers of speculation); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 188 (finding the Board's lack of regulatory authority over separate oil projects an important reason as to why it did not have to analyze those separate effects). And again, there is no timetable for future development. Although the City characterizes this development as a "quick development," R. [53-8] at 134, this could mean anything. The area could be developed in one year, in twenty years, or it could be developed slowly in stages. Moreover, in the event of an economic downturn, any future development could be forestalled. *See Gulf Restoration Network*, 452 F.3d at 370 (listing market volatility as one of the layers of speculation).

At bottom, the DOT drew a "manageable line" that encompassed the effects of the roadway Project while excluding the effects of speculative projects that are separate in time and place. *See Seven Cnty. Infrastructure Coal.*, 605 U.S. at 189 ("[T]he fact that other projects might foreseeably be built or expanded in the wake of the current project does not, by itself, make the agency responsible for addressing the environmental effects of those other projects. The agency may draw what it reasonably concludes is a 'manageable line'—one that encompasses the effects of the project at hand, but not the effects of projects separate in time or place." (quotation omitted)); *see also Gulf Restoration Network*, 452 F.3d at 369-70. Plaintiffs' arguments to the contrary "essentially amount to a preference for more detail and

31

more explanation in the NEPA cumulative-impacts-analysis portion of the [Final]

EA.*" Indigenous Peoples of Coastal Bend*, 132 F.4th at 888; *see* Mem. [69] at 20

(arguing that the Final EA did not follow "best practices for evaluating future

impacts").  But that is not the standard.  *See Indigenous Peoples of Coastal Bend*,

132 F.4th at 888.  After factoring out separate and speculative actions, and

adjusting the scope of the analysis accordingly, the Court finds that the Final EA's

cumulative impact analysis was not arbitrary or capricious.  *See, e.g.*, *id.*; *Fath*, 924

F.3d at 139-40; *Atchafalaya Basinkeeper*, 894 F.3d at 704; *Seven Cnty.*

*Infrastructure Coal.*, 605 U.S. at 187-88.

B.     Reasonable Alternatives Outside the City's Jurisdiction

Plaintiffs argue that Defendants failed to consider reasonable alternatives

discussed in the PEL study simply because those alternatives did not fall within the

City's jurisdiction.  *See* Mem. [69] at 22-26; Reply [74] at 6-8.  But Plaintiffs

simultaneously seem to acknowledge that the Final EA did in fact discuss these

alternatives.  *See* Mem. [69] at 23-24; Reply [74] at 6-7; R. [53-5] at 25-29.  Although

the PEL study identified seven different alternatives worthy of further analysis, the

Preliminary, and later the Final, EA eliminated six of them after a brief discussion

and only carried one alternative, the Airport Road Extension,[9] forward for a more

detailed analysis.[10]  *See* R. [40-3] at 34; R. [53-5] at 29.  Plaintiffs' argument

---

[9] As previously discussed, this is referred to as "Alternative B" in the EAs.  *See* R. [40-3] at 34-35; R. [53-5] at 29-30.

[10] The Preliminary and Final EA also briefly discussed and then eliminated an alternative from a 2011 study, titled "*The Community's Plan for the Turkey Creek and North Gulfport Neighborhoods*," and alternatives raised during public involvement meetings.  *See* R. [40-3] at 30-31; R. [53-5] at 25-26.  Plaintiffs do not challenge the dismissal of these alternatives, *see generally* Mem. [69] at 22-26, so the Court will not address them.

therefore is better characterized as an argument that the DOT's brief explanation for dismissing these alternatives was arbitrary and capricious, rather than an argument that it outright failed to evaluate them.  *See* Mem. [69] at 24-26.

1.    The Six Omitted Alternatives Discussed in the Final EA

Under NEPA, an EA must consider "a reasonable range of alternatives that are technically and economically feasible, and meet the purpose and need for the proposed action."  40 C.F.R. § 1508.1(hh); *see also* 40 C.F.R. § 1501.5(c).  Like its discussion of reasonable impacts, an EA's discussion of reasonable alternatives need only be brief.  *See Espy*, 38 F.3d at 802-03 ("An EA must include brief discussions . . . of alternatives . . . ." (quotation omitted)); *see also* 40 C.F.R. § 1501.5(c); *Louisiana Crawfish Producers Ass'n-W. v. Rowan*, 463 F.3d 352, 357 (5th Cir. 2006) (noting that "the burden on [an] agency to consider reasonable alternatives is much heavier" for an EIS than an EA).

Here, the Final EA briefly discussed the seven alternatives identified in the PEL study before finding that only one met the Project's goals.  *See* R. [53-5] at 27-29.  Specifically, the Final EA concluded that

> [t]here were seven projects recommended in the PEL study, however the Airport Road extension is the only corridor that falls within the City's jurisdiction.  It was included in the final recommendations.  The other 6 projects are improvements to MDOT facilities.  Although five of the seven projects recommended in the PEL study are interrelated and associated with the US 49/I-10 interchange, the Airport Road extension project is the only one that has independent utility.

*Id.* at 29. Plaintiffs are not satisfied with this conclusion and contend that this finding was arbitrary and capricious because the DOT was required to consider alternatives outside the City's jurisdiction. *See* Mem. [69] at 24; Reply [74] at 6-8.

While Plaintiffs are correct that an "agency must consider appropriate alternatives which may be outside its jurisdiction or control, and not limit its attention to just those it can provide," *Sierra Club v. Lynn*, 502 F.2d 43, 62 (5th Cir. 1974), it need not consider unreasonable alternatives, *see* Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026, Question 2a (March 23, 1981) ("In determining the scope of alternatives to be considered, the emphasis is on what is '*reasonable*' rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative." (emphasis added)). "[T]he goals of an action delimit the universe of the action's reasonable alternatives," *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991), and as the Fifth Circuit has stated, "NEPA only requires the consideration of alternatives relevant to the applicant's goals . . . ," *Citizens for Clean Air & Clean Water in Brazoria Cnty. v. U.S. Dep't of Transp.*, 98 F.4th 178, 195 (5th Cir. 2024) (quotation omitted); *see also Concerned Citizens Coal. v. Fed. Highway Admin.*, 330 F. Supp. 2d 787, 797 (W.D. La. 2004), *aff'd*, 134 F. App'x 760 (5th Cir. 2005).

One problem with Plaintiffs' argument is that the scope of the PEL study was broader than that of the Preliminary and Final EA's. The PEL study looked both at improvements at the Interchange and at mobility improvements generally along

34

U.S. 49.  *See* R. [53-8] at 89.  In contrast, the purpose and need of the EAs focused specifically on congestion issues along U.S. 49 and at the Interchange, connectivity issues west of the Interchange, and economic growth in the immediate area.  *See* R. [53-5] at 23; R. [40-3] at 29.  Many of the alternatives discussed in the PEL study would have nothing to do with these needs or would only partially address them.[11] Plaintiffs rightly maintain that the crux of the Project – the I-10 and U.S. 49 interchange – is literally within the City's geographic limits.  *See* Mem. [72] at 23. The question therefore becomes not one of jurisdictional considerations, but rather of reasonable ones.  And because the Final EA found that only one alternative satisfied the updated goals of the Project, it acted appropriately in briefly discussing and then rejecting the other six alternatives.  *See Citizens for Clean Air & Clean Water in Brazoria Cnty.*, 98 F.4th at 195; *Espy*, 38 F.3d at 802-03.

Plaintiffs also question the Final EA's statements regarding independent utility.  *See* R. [53-5] at 29; Mem. [69] at 24-26; Reply [74] at 6.  The Court agrees that these statements are somewhat ambiguous.  *See* R. [53-5] at 29.  The Final EA appears to state that of the five interrelated projects, only the Airport Road Extension has independent utility.  *See id.*  Plaintiffs seem to interpret this as the Final EA stating that only one project has independent utility.  *See* Mem. [69] at 25-26.  The Court is unable to confirm this finding based on the administrative record because neither the Final EA nor the PEL study explain which alternatives were

---

[11] For instance, one alternative, the "Lorraine Road Interchange Improvements," looked at improving an interchange along I-10 and Lorraine Road, roughly four miles east of the I-10 and U.S. 49 interchange.  *See* R. [53-8] at 98.

considered to fall within the City's jurisdiction, nor do they define the criteria for "independent utility." *See generally* R. [53-5] at 25-40; R. [53-8] at 86-102.

But this conclusion, even if flawed, does not render the Final EA's alternatives analysis arbitrary and capricious. *See Lynn*, 502 F.2d at 62 (holding that an agency "fully complied with NEPA" despite finding that its "treatment of alternatives was less than exhaustive"); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185 ("Even if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS."). The Final EA determined that of all alternatives, the Airport Road Extension was the only one that met the Project's goals. *See* R. [53-5] at 29, 40. It briefly discussed, then dismissed, the other alternatives, and went on to further analyze the chosen alternative. *See id.* at 25-40; *see also* discussion *infra* Section IV.B.2.

To the extent that this brief discussion is ambiguous, the PEL study, including its more thorough alternatives discussion, is attached to Appendix A of the Final EA and is directly referenced in its alternatives analysis. *See* R. [53-8] at 91-102; R. [53-5] at 25-29. And the brief discussion, coupled with the PEL study, supports the conclusion that the Final EA made a "fully informed and well-considered decision" in carrying forward only one alternative for a more detailed analysis. *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558 (1978); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182 ("As

36

this Court has said, the term 'alternatives' is not self-defining, and '[c]ommon sense'

should be brought to bear." (quotation omitted)).

2.        The Alternatives Further Discussed in the Final EA

The Final EA's alternatives analysis did not end with the discussion on PEL

study alternatives; it went on to further explore three other alternatives. *See* R.

[53-5] at 29-40.  These are the previously mentioned Alternative A, Alternative B,

and Preferred Alternative C. *See id.*

With regard to Alternative B, the Final EA states that "the engineering

analysis determined that the alternative was not a viable alternative and that its

alignment needed adjusting to create a viable build alternative," *id.* at 30, and lists

six different reasons why it was eliminated, *id.* at 32.  For instance, discussions

with Mississippi Power Company revealed that Alternative B would conflict with

power lines, discussions with the KCS Railroad indicated that Alternative B's

railroad crossing was not in a feasible location, and a review of ownership deeds

revealed that the proposed road alignment ran through a conservation easement.

*See id.*

And with respect to Alternative A, the Final EA found that

> The No Build Alternative [] would not provide connectivity among
> current businesses, the Gulfport-Biloxi International Airport, and
> properties otherwise separated by Interstate 10.  The public safety issue
> of a single ingress and egress point across the [KCS] Railroad crossing .
> . . would not be resolved.  The No Build Alternative would not address
> relieving the traffic loads currently on US Highway 49 or aid the traffic
> movements between the airport and the area businesses on the north
> and south sides of I-10.

*Id.* at 33.  This left Alternative C, which the Final EA found would address the Project's needs and was "the most viable build alternative."  *Id.* at 40.

Ultimately, "NEPA does not impose any minimum number of alternatives that must be evaluated," *Nat'l Wildlife Fed'n v. United States Army Corps of Eng'rs*, 75 F.4th 743, 757 (7th Cir. 2023) (quotation omitted), and the Fifth Circuit has upheld similar alternatives analyses on prior occasions, *see Louisiana Crawfish Producers Ass'n-W.*, 463 F.3d at 356 ("The Corp's EA . . . discussed three alternatives: a no-action plan, the original plan articulated in the 1982 EIS, and the plan ultimately adopted."); *City of Dallas v. Hall*, 562 F.3d 712, 718 (5th Cir. 2009) ("The EA in this case . . . analyzed the effects of three different alternatives (no action, a larger refuge, and a smaller refuge) . . . .").  Moreover, the range of alternatives to consider "decreases as the environmental impact of the proposed action becomes less and less substantial."  *Louisiana Crawfish Producers Ass'n-W.*, 463 F.3d at 357 (quotation omitted); *see also Hall*, 562 F.3d at 719 (finding that a range of alternatives was reasonable "*especially* given that [the agency] concluded that the project had no significant environmental impact" (emphasis added)).

Given the detailed analysis in the Final EA, the FONSI, and the discretion owed to the DOT, the Court finds that the Final EA's alternatives analysis was not arbitrary or capricious.  *See Friends of Ompompanoosuc v. FERC*, 968 F.2d 1549, 1558 (2d Cir. 1992) ("It is well-settled that under NEPA the range of alternatives that must be discussed is a matter within an agency's discretion."); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 182-83 ("When assessing . . . feasible alternatives

38

for purposes of NEPA, an agency will invariably make a series of fact-dependent, context-specific, and policy-laden choices about the depth and breadth of its inquiry . . . . Courts should afford substantial deference and should not micromanage those agency choices so long as they fall within a broad zone of reasonableness."); *Hall*, 562 F.3d at 719; *Louisiana Crawfish Producers Ass'n-W.*, 463 F.3d at 357; *see also* R. [53-4] at 94; R. [53-5] at 25-40.

3.      The Ranking of Alternatives in the PEL Study

Plaintiffs also make several references to the ranking of alternatives in the PEL study and the fact that the Airport Road Extension was the lowest ranked project among the other alternatives, seemingly in an effort to highlight the capricious nature of the Final EA's decision to adopt that alternative. *See* Mem. [69] at 22-23, 24, 25-26. This argument is unpersuasive.

"Once an agency adequately addresses alternatives to its proposed action, 'the decision of which alternative to follow is within the agency's discretion.'" *Sabine River Auth. v. U.S. Dep't of Interior*, 745 F. Supp. 388, 399 (E.D. Tex. 1990) (quoting *S. Louisiana Env't Council, Inc. v. Sand*, 629 F.2d 1005, 1017 (5th Cir. 1980)), *aff'd*, 951 F.2d 669 (5th Cir. 1992). It is not the province of this Court to weigh alternatives and second-guess agency findings. *See, e.g.*, *Seven Cnty. Infrastructure Coal.*, 605 U.S. 168 at 183 ("A reviewing court may not substitute its judgment for that of the agency as to the environmental consequences of its actions." (quotation omitted)); *see also Clairton Sportsmen's Club v. Pennsylvania Tpk. Comm'n*, 882 F. Supp. 455, 478 (W.D. Pa. 1995) ("The [c]ourt likewise is in no

position to weigh the various advantages allegedly offered by the . . . alternative.  To do so would require a relative assessment of the reasonableness of the alternatives the Agencies *did* consider in detail. This would bear too strong a resemblance to the process the Agencies already carried out to fall within the Court's province." (emphasis in original)).

C.     Conclusions Regarding Traffic Congestion

Plaintiffs next challenge the DOT's conclusion that the Project will relieve traffic congestion, *see* Mem. [69] at 26-31, which is premised on a 2022 traffic study found in Appendix B of the Final EA, *see* R. [53-8] at 203 to -[53-9] at 18.  This study updated and expanded upon an earlier study from 2020 that was included in the Preliminary EA.  *See* R. [53-8] at 207; R. [42-2] at 84 to -[42-3] at 9.

1.     The Traffic Studies

The original traffic study from 2020 was conducted by the engineering consultant firm Neel-Schaffer, Inc. ("Neel-Schaffer") and looked at traffic patterns at the intersection of U.S. 49, Poole Street, and Airport Road.  *See* R. [42-2] at 87 to -[42-3] at 9.  Specifically, the study focused on Level of Service ("LOS")[12] metrics during the peak P.M. hour for three different conditions: existing conditions as of 2019; 2045 future conditions if nothing is built; and 2045 future conditions if a roadway alternative is built.  *See* R. [40-3] at 34; R. [42-3] at 1, 5, 9.  An intersection

---

[12] "Level of service (LOS) is the term used to refer to a collection of measures of automobile congestion and travel time delay, and it is among the longest-standing and most widely adopted metrics for reporting transportation system performance in the country."  *Evolving Use of Level of Service Metrics in Transportation Analysis – Introduction*, U.S. DEPT. OF TRANSP. (2017), https://www.transportation.gov/sites/dot.gov/files/docs/LOS%20Case%20Study%20Introduction_508. pdf (last visited March 16, 2026).

with an LOS rated "A" is "the most desirable condition and reflects conditions in which a user can expect the least amount of delay . . . ," while an "F" indicates "significant delays" and may also mean that demand at that intersection has exceeded capacity. R. [53-8] at 218. The Preliminary EA also included traffic models from the Gulf Regional Planning Commission ("GRPC"), looking at no-build versus build traffic projections for the years 2025 and 2045. *See* R. [42-4] at 28-35.

The study showed marginal, if any, improvements to the intersection at U.S. 49, Poole Street, and Airport Road, finding that its overall LOS grade drops from a C to an F regardless of whether the Project is built. *See* R. [40-3] at 34; R. [42-3] at 1, 5, 9. But the GRPC models showed a reduction in average daily traffic on the southern side of the Interchange from 89,705 to 86,757 vehicles per day for the 2045 build model when compared to the 2045 no-build model. *See* R. [42-4] at 33, 35. The study did not consider future traffic as a direct result of induced development.

During the public comment phase on the Preliminary EA, Plaintiff Sierra Club submitted a comment (the "Comment") detailing its objections to the Project. *See generally* R. [53-20] at 18-59. Many of these objections mirror those raised in the present Motion [68], *see generally id.* at 19-38, but of particular note, the Comment argues that the Project's net impact on traffic congestion in the area will actually be much worse than the Preliminary EA estimated due to the traffic generated by future development, *id.* at 22-23. The Comment includes a report by traffic engineer Adam Kirk ("Dr. Kirk"), which found that "[t]his high volume of traffic [from future development] on the Airport Road Extension will further impact

41

traffic operations on US 49 at the I-10 Interchange, significantly more than is shown to occur with only the road connection" in the Preliminary EA.[13]  *Id.* at 43.

Appendix B to the Final EA includes an updated traffic study prepared by Neel-Schaffer in 2022.  *See* R. [53-8] at 203 to -[53-9] at 18.  It includes data from the original study, *see* R. [53-8] at 191-202, 213, 216, but also expands upon it by collecting updated traffic counts and evaluating three additional intersections: U.S. 49 at Landon Road and Crossroads Parkway, U.S. 49 at Creosote Road, and U.S. 49 at Middle Drive, *see id.* at 207.  With this updated data, the study included a similar analysis of LOS metrics for both A.M. and P.M. peak hours at the now four intersections by comparing existing[14] traffic data with projected 2045 data for the build versus no build alternatives.  *See id.* at 219-220.  And based on this analysis, it found that

> while the new roadway does not completely alleviate traffic congestion along US Highway 49, it does improve overall delay when compared to the No Build and offers an alternate route for through traffic and additional access points for existing developments west of US Highway 49 including a new connection across I-10.

*Id.* at 221.  The updated study likewise referenced the GRPC models that showed a reduction in average daily traffic on the southern side of the Interchange, *id.* at 213, 216, and it did not consider future traffic as a direct result of induced development.

---

[13] Dr. Kirk also prepared a traffic study after the close of public comment period and in response to the Final EA.  *See* Ex. [66-1].  This report was the subject of Plaintiffs' Motion [66] for Consideration of Extra-Record Evidence.  *See generally* Mot. [66].  For the reasons discussed in Order [77], this request was denied, and so the Court will not consider it here.  *See generally* Mem. Op. & Ord. [77].

[14] The "Existing Year" for the updated study was updated from 2019 in the Preliminary EA to 2022 to reflect the new data that Neel-Schaffer collected.  *See* R. [53-8] at 210.

Plaintiffs now argue that this conclusion is arbitrary and capricious because the study failed to consider future traffic as a result of induced development. *See* Mem. [69] at 26-31; Reply [74] at 8-10. Plaintiffs further imply that the Project may not reduce traffic regardless of the induced development based on statements made by Neel-Schaffer consultants contained in the administrative record. *See* Mem. [69] at 29-30. And finally, Plaintiffs take issue with the fact that Defendants did not directly respond to the Sierra Club's Comment and explain why they did not consider additional traffic from future development. *See id.* at 27, 30-31.

2.      Future Traffic Resulting from Induced Development

Plaintiffs maintain that traffic resulting from commercial development induced by the Project is "an important aspect of the problem" that the DOT "entirely fail[ed] to consider." Mem. [69] at 28-29 (quoting *Motor Vehicles Mfrs. Ass'n*, 463 U.S. at 43). They cite to Dr. Kirk's study where he used a trip generating model to determine that, based on 2.8 million square feet of retail space, future development would generate over 78,000 trips per day in the area, *see* R. [53-20] at 43, and they argue that this failure to account for 78,000 additional trips per day renders the Final EA's traffic conclusions arbitrary and capricious, *see* Mem. [69] at 28-29; Reply [74] at 9-10.

As a preliminary matter, the Final EA did account for future traffic growth in the area. Both the Preliminary and Final EA compared possible alternatives against traffic projections for the year 2045. *See* R. [42-3] at 5, 9; R. [42-4] at 33, 35; R. [53-8] at 213, 216, 220-21. These projections were either provided for in the

43

GRPC traffic models, *see* R. [53-8] at 213, 216; R. [42-4] at 33, 35, or were calculated by Neel-Schaffer based on data it collected, *see* R. [53-8] at 210; R. [42-3] at 5, 9. The issue here is specifically with the DOT's decision not to consider any additional future traffic caused as a direct result of induced development. *See* Mem. [69] at 28-29.

But at its core, Plaintiffs' contention on this point is a dispute about methodology. Plaintiffs' expert included traffic estimates from future development in his analysis, whereas the DOT's did not. *Compare* R. [53-20] at 43-44 (Plaintiffs' expert opinion), *with* R. [53-8] at 219-221 (the DOT's expert opinion). And as a general rule, "[a]gencies are entitled to select their own methodology as long as that methodology is reasonable" and "[t]he reviewing court must give deference to an agency's decision." *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 289 (4th Cir. 1999) (collecting cases); *see also, e.g., Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("[A]n agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 175 (5th Cir. 2000); *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 185 ("The bedrock principle of judicial review in NEPA cases can be stated in a word: Deference."). In other words, in a "battle of the experts," deference is owed to the agency. *See Spiller v. White*, 352 F.3d 235, 244 (5th Cir. 2003).

It is not altogether surprising that the DOT's experts did not include traffic estimates from future development as statements in the Final EA and

44

administrative record reflect that such development was considered to be too speculative throughout the approval process. *See* R. [53-5] at 165-66; R. [53-20] at 82. Plaintiffs attempt to liken this case to *North Carolina Alliance for Transportation Reform, Inc. v. U.S. Department of Transportation*, 151 F. Supp. 2d 661 (M.D. N.C. 2001), in which the court found that it was arbitrary and capricious for an agency to use the same statistical data in comparing a build versus no-build alternative. 151 F. Supp. 2d 661, 689 (M.D. N.C. 2001); *see* Mem. [69] at 30; Reply [74] at 9. But the Court is less persuaded by this nonbinding case than by its own prior findings based upon this administrative record and more recent Supreme Court precedent.

The Court has previously found that it was reasonable for the DOT not to consider the future effects of induced development in its impact analysis because such development is too speculative and would constitute a separate project, thus breaking the causal chain of effects. *See* discussion *supra* Section IV.A.3.b; *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88. Applying that same rationale here, the Court cannot say it was arbitrary and capricious for the DOT's methodology to exclude speculative future data from its analysis. *See, e.g., Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88; *Hughes River Watershed Conservancy*, 165 F.3d at 283; *Westphal*, 230 F.3d at 175; *Spiller*, 352 F.3d at 244 ("[T]he dispute between the [plaintiffs and defendants] here is best classified as a classic battle of the experts, with each party asserting that their analysis is more reasonable than

45

the other's.  Under the highly deferential standard afforded to agencies pursuant to NEPA, however, it is not the job of the federal courts to intervene in this fight.").

3.      The Findings in the Updated Traffic Study

Notwithstanding future development, Plaintiffs appear to argue that the Preliminary and Final EA's traffic analyses actually show that the Project would increase traffic delays, thus rendering Defendants' conclusion to the contrary arbitrary and capricious.  *See* Mem. [69] at 30.

In regard to the Preliminary EA, Plaintiffs argue that Dr. Kirk's report "actually showed the [P]roject increased delays."  Mem. [69] at 27.  But this is not entirely accurate.  While Dr. Kirk opined that the traffic study in the Preliminary EA showed that the Project would increase delays at the one intersection it analyzed*, see* R. [53-20] at 42, he also acknowledged that the Project creates a potential "3.2 percent reduction in traffic from the no build to the build condition on US 49 at the I-10 interchange," *id.* at 43.  He may have characterized this as "a minimal amount of traffic," *id.* at 44, but the DOT found that this was one of several benefits that made the Project worth pursuing, *see* R. [40-3] at 45, 59, and, as previously discussed, the Court cannot second-guess those findings, *see Sand*, 629 F.2d at 1017.

Turning to the Final EA, Plaintiffs offer email communications between Neel-Schaffer employees, which they claim undermine whether the traffic analysis in the Final EA actually shows a decrease in traffic.  *See* Mem. [69] at 30.  A closer reading

46

of this conversation, in the Court's view, shows the opposite. Specifically, one Neel-Schaeffer consultant stated:

> Across both the AM and PM peak hours, the combined average travel delay per vehicle for all four study intersections is expected to increase by 11.7 sec in the No Build and only 7.1 sec in the Build over Existing conditions. This corresponds to a delay savings of 4.6 sec per vehicle or a total delay savings of 49.3 veh-hrs every workday . . . . Is there a way to look like we have more delay savings?

R. [47-2] at 29.

But in response, another consultant explains that delays are expected to increase at some intersections and decrease at others due to the new alternate route, which is why "looking at only delay might show an improvement or very well no improvement or a minor increase." *Id.* at 27-28. He further states that other measurements, such as arterial travel speed and average travel time, may be more effective at evaluating overall changes to a corridor. *See id.* at 28. This is all the more reason to defer to the DOT's own experts given the intricate nature of the Project. *See, e.g.*, *Westphal*, 230 F.3d at 175; *Spiller*, 352 F.3d at 244; *Hughes River Watershed Conservancy*, 165 F.3d at 283.

> That being said, there is merit to the Final EA's conclusion that
>
> while the new roadway does not completely alleviate traffic congestion along US Highway 49, it does improve overall delay when compared to the No Build and offers an alternate route for through traffic and additional access points for existing developments west of US Highway 49 including a new connection across I-10.

R. [53-8] at 221. When comparing 2045 projections for the Build versus No-Build alternatives, the Build Alternative shows LOS improvements at three of the four intersections depending on the peak hour of traffic (A.M. or P.M.), a negative impact

to only one intersection, again depending on the peak hour of traffic, and no impacts to another intersection. *Id.* at 220. On the whole, this is an overall improvement among the various intersections when compared to the No-Build Alternative, *see id.* at 220-221, to say nothing of the GRPC models that also project a modest reduction in traffic south of the Interchange in the 2045 Build scenario, *compare id.* at 213 (2045 No Build model), *with id.* at 216 (2045 Build model), plus the additional traffic benefits of the new roadway, such as providing additional access points for existing developments west of U.S. 49, *id.* at 220.

The Court is not a "professional transportation analyst charged with the duty of determining the propriety of competing methodologies." *Ware v. U.S. Fed. Highway Admin.*, No. Civ. A. H-04-2295, 2006 WL 696551, at *19 (S.D. Tex. Mar. 15, 2006) (quotation omitted), *aff'd*, 255 F. App'x 838 (5th Cir. 2007). It has reviewed the record and corresponding traffic studies strictly to determine whether or not the DOT acted arbitrarily and capriciously. It did not. *See, e.g.*, *Westphal*, 230 F.3d at 175; *Spiller*, 352 F.3d at 244.

4.    The DOT's Alleged Failure to Respond to the Sierra Club's Comment

Plaintiffs maintain that in drafting the Final EA, the DOT "sidestepped the issue" of traffic increases from future development, Mem. [69] at 25 (internal quotation marks omitted and cleaned up) (quoting *Ohio v. EPA*, 603 U.S. 279, 295 (2024)), and "le[ft] unrebutted" Dr. Kirk's traffic analysis submitted during public comment, *id.* at 26 (quotation omitted); *see also* Reply [74] at 10. And by failing to

48

respond to the Sierra Club's Comment, the DOT's conclusions were arbitrary and capricious.  *See Chamber of Com. of U.S. v. SEC*, 85 F.4th 760, 774 (5th Cir. 2023).

First, the Project received many public comments, *see generally* R. [53-16] at 26 (Appendix J), many of which involved traffic concerns, *see, e.g.*, R. [53-17] at 5-7, 17, 36-37, 178; R. [53-19] at 16, 29, 38, 53, 236; R. [53-20] at 6, 14-16, 22-23, 66, 72-73.  Defendants broadly responded to these comments, including those from the Sierra Club, by issuing an updated traffic study in the Final EA.  *See* R. [53-8] at 207 ("The [Traffic Analysis Report] was prepared in response to the public hearing process . . . .").  Plaintiffs are not satisfied with this response and appear to contend that the Comment was significant such that it required its own response from the DOT explaining the alleged shortcomings in the Preliminary EA's traffic study and why it did not account for traffic from future development in the Final EA.  *See* Mem. [69] at 27, 28-29, 30-31; Reply [74] at 10.

Although "[a]n agency need not respond to every comment," *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir.), *supplemented*, 713 F.2d 795 (D.C. Cir. 1983), it must still "show that it has 'reasonably considered the relevant issues and reasonably explained the decision.'  That requires the agency to consider all relevant factors raised by the public comments and provide a response to significant points within," *Chamber of Com. of U.S.*, 85 F.4th at 774 (citation omitted) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)).

"Comments the agency must respond to include those that can be thought to challenge a fundamental premise underlying the proposed agency decision or

49

include points that if true and adopted would require a change in an agency's proposed rule." *Id.* (footnotes and quotations omitted). However, an agency is "not required to 'conduct or commission [its] own empirical or statistical studies' to confirm or reject [] speculative costs identified" in public comments, *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 454 (5th Cir. 2021) (quoting *Prometheus Radio Project*, 592 U.S. at 427), and it "need not respond at all to comments that are purely speculative and do not disclose the factual or policy basis on which they rest," *id.* (quotation omitted).

The Court views this argument as a roundabout way of again attacking the findings of the DOT's experts. Unlike in the case Plaintiffs cite, *see* Mem. [69] at 29, the agency here was not soliciting commentators to provide it with data that would help quantify the impacts of the Project, *cf. Chamber of Com. of U.S.*, 85 F.4th at 774, and Plaintiffs were not offering "data that was either readily accessible to, or already in the possession of" the DOT, *id.* at 776. Instead, Plaintiffs introduced a competing expert opinion that took into account traffic estimates based on speculative future development to ultimately reach a conclusion opposite the DOT's. *See* R. [53-20] at 43-44. The DOT did not have to adopt this opinion. *See, e.g.*, *Spiller*, 352 F.3d at 244; *see also Texas Bankers Ass'n v. Consumer Fin. Prot. Bureau*, No. 7:23-CV-144, 2024 WL 3939598, at *12 (S.D. Tex. Aug. 26, 2024) ("[A]n agency does not fail to 'consider' a concern or suggestion simply because it reached a different conclusion."). The DOT did not have to collect new data to estimate future traffic based on this opinion. *See Chamber of Com. of U.S.*, 85 F.4th at 776 (citing

*Prometheus Radio Project*, 592 U.S. at 427); *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88.  And ultimately, the DOT did not have to respond to this opinion any more than already provided for in the Final EA.  *See California v. Block*, 690 F.2d 753, 773 (9th Cir. 1982) (noting that an agency is not "duty-bound to resolve conflicts raised by opposing viewpoints").

5.      The DOT's Alleged Failure to Consider the Costs of Induced Development

Plaintiffs make fleeting references to a possible cost-benefit argument.  *See* Mem. [69] at 30 ("[S]ince the agency chose to trumpet the benefits of the activity as a 'selling point,' for the project, NEPA therefore requires full disclosure and analysis of their costs." (internal quotation marks and emphasis omitted) (cleaned up) (quoting *Sigler*, 695 F.2d at 979)); *id.* at 29 ("[An] agency is required to respond to significant points in comments and violate[s] [the] APA by failing to respond to comments to conduct a proper cost-benefit analysis." (citing *Chamber of Com. of U.S.*, 85 F.4th at 780)).  And, like their references to the PEL study's alternative rankings, Plaintiffs frequently mention the fact that the Project's costs will likely exceed its benefits.  *See* Mem. [69] at 7, 29, 30.  "NEPA 'mandates at least a broad, informal cost-benefit analysis by federal agencies of the economic, technical, and environmental costs and benefits of a particular action.'"  *Indigenous Peoples of Coastal Bend*, 132 F.4th at 885 (quoting *Sigler*, 695 F.2d at 978).  But to the extent Plaintiffs suggest a failure to conduct such a cost-benefit analysis, this argument is misplaced.

The Final EA includes a cost-benefit analysis that was prepared as part of the BUILD Grant application. *See* R. [53-8] at 146-150. Aside from broad and somewhat vague references, Plaintiffs do not articulate any specific objections to this analysis. *See generally* Mem. [69]; Reply [74]; *see, e.g., Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 72 F.4th 1166, 1185 (10th Cir. 2023) (noting that the "burden of proof rests with the appellants who challenge" an agency's actions under NEPA (quotation omitted)). As summarized in a response to public comments:

> The benefit cost analysis determined that an overall benefit-cost ratio of 2.77 was obtained and a benefit-cost cost ratio of 1.26 is obtained at the 7% discount rate; a benefit to cost ratio greater than 1.00 supports the worthwhile nature of this project. In addition, the project will provide a reduction in greenhouse gas emissions . . .; access options to the outlet mall will improve . . .; quality of life will improve for both users of these commercial areas and workers . . .; finally, the addition of improved public right-of-way access will increase adjacent property values. When considering these unquantified benefits, the true benefit-to-cost ratio is anticipated to be much higher than the value reported.

R. [53-20] at 72.

The cost-benefit analysis in the BUILD Grant application is sufficient to satisfy NEPA's mandate. *See Indigenous Peoples of Coastal Bend*, 132 F.4th at 886. To the extent that Plaintiffs' grievances lie with the DOT's lack of accounting for the adverse impacts of future development, "the scope of analysis used for analyzing both impacts and alternatives should be the same scope of analysis used for analyzing the benefits of a proposal," *id.* (quotation omitted) (adopting this standard after rejecting the application of *Sigler*), and the Court has previously found that the effects of induced development are too speculative and fall outside the purview

52

of the Final EA's impacts analysis, *see* discussion *supra* Sections IV.A.2 & A.3.b; *see also Seven Cnty. Infrastructure Coal.*, 605 U.S. at 187-88.

D.    Mitigation Measures for Wetlands and Streams

Plaintiffs challenge the FONSI by arguing that "the [Final] EA contains only conclusory and unsupported statements that mitigation will reduce to insignificance the destruction of 96 acres of" wetlands and 1,450 linear feet of intermittent and ephemeral streams, Mem. [69] at 34, and that "[a]t bottom [the DOT] is saying that another agency – the [Corps] – will make sure that the admitted impacts of the project will be mitigated below the level of significance," *id.* at 33; *see also id.* at 31-35; Reply [74] at 10-11.  Plaintiffs cite to several statements in the Final EA that they claim are too vague and rely too heavily on another agency's future review to allow for a finding of no significant impact.  *See* Mem. [69] at 32-33.

1.    FONSI versus "Mitigated" FONSI

Plaintiffs discuss at length the Fifth Circuit's holding in *O'Reilly*, 477 F.3d at 231, and how "reliance on mitigation measures may reduce a project's impacts below the level of significance" required to prepare an EIS, so long as such reliance is not merely "perfunctory or conclusory," *id.*; *see also* Mem. [69] at 32-33, 34; Reply [74] at 10-11.  But *O'Reilly* was discussing the standard for evaluating a *mitigated* FONSI, not just a FONSI.  *O'Reilly*, 477 F.3d at 229.  A "'mitigated FONSI' means that without mitigation, a project will have a 'significant' environmental impact." *Atchafalaya Basinkeeper*, 894 F.3d at 698.  It is unique in that a "third party agrees to employ certain mitigation measures that will lower the otherwise significant

impacts of an activity on the environment to a level of insignificance." *Spiller*, 352 F.3d at 241.

Despite Plaintiffs' insistence to the contrary, *O'Reilly* is not "directly on point" because this case does not involve a mitigated FONSI. *See* Mem. [69] at 33; Reply [74] at 10; R. [53-4] at 94. As Defendants point out, the Final EA "does not depend on mitigation for its findings of no significant impact." Resp. [72] at 31; R. [53-4] at 94. Not to understate this distinction, the Fifth Circuit has found that it is reversible error to analyze a standard FONSI under the same standard applied to a mitigated FONSI. *See Atchafalaya Basinkeeper*, 894 F.3d at 698-99 ("The court's misplaced view that the Corps issued a 'mitigated FONSI' is an error of law that steered it in the wrong direction."). Indeed, it appears as though Plaintiffs make the very error that *Atchafalaya Basinkeeper* warned of: conflating a standard FONSI with a mitigated FONSI. *See id.*; *see also* Mem. [69] at 32-33, 34; Reply [74] at 10-11.

This is not to say that an EA with a standard FONSI need not include any mitigation discussion. An EA must still discuss the reasonably foreseeable impacts of a project, *see, e.g.*, 40 C.F.R. § 1501.5(c); *id.* § 1508.1(i); *Gulf Coast Rod, Reel & Gun Club, Inc.*, 676 F. App'x at 249, which may naturally involve mitigation measures, *see Atchafalaya Basinkeeper*, 894 F.3d at 698 (noting, even after clarifying that the FONSI at issue was not a mitigated FONSI, that "both EAs here acknowledged potential environmental impacts from the project, discussed third parties' concerns about those impacts, referenced in detail the hydrological,

54

horticultural and wildlife environment in the affected acreage of the Basin, and explained how and where mitigation bank credits and construction protocols would be adopted to render the watershed impact not 'significant'"). Ultimately, an agency's decision to adopt a standard FONSI need only "reasonably be discerned," *id.* at 699 (internal quotation marks omitted) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 US 644, 658 (2007)); in other words, it cannot be arbitrary and capricious, *see Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 239 (5th Cir. 2006).

2.    Mitigation Measures in the Final EA

a.    Wetlands

Similar to *Atchafalaya Basinkeeper*, the DOT's path to issuing a FONSI can be reasonably discerned here. *See* 894 F.3d at 699. The Environmental Impacts section in the Final EA, which relies on a wetlands report found in Appendix F, *see generally* R. [53-12] at 17-148, and a floodplain assessment found in Appendix G, *see generally* R. [53-12] at 149 to -[53-13] at 63, discusses a detailed stormwater mitigation plan, *see* R. [53-5] at 80-96; *see generally* R. [53-5] at 50-169. This mitigation plan, for which the Final EA allocates $5.64 million, *see id.* at 169, includes a storm sewer drainage system, a 60-acre retention pond, and various other improvements, such as culvert crossings and channel modifications, *see id.* at 141; R. [53-4] at 95.

Based on the floodplain assessment in Appendix G, the Final EA found that:

For the area that is part of the Bernard Bayou watershed (Daniel Boulevard Extension), mitigation will be provided inline within

55

oversized road ditches.  For the area that is part of the Turkey Creek watershed, the assessment indicates that the proposed improvements, including the retention pond, will mitigate all peak runoff from the project features for the areas downstream ensuring that the proposed project will have no impact on flooding in the Forest Heights subdivision or any downstream communities.

R. [53-5] at 139.  It further found that by capturing overland flow in the retention pond and discharging the stormwater runoff at a controlled rate into an existing stream, the Project may actually enhance flood protection for the communities downstream of the Project.  *Id.* at 141.  As a result, the Final EA found that the Project will have no effect on Federal Emergency Management Agency ("FEMA") floodplains.  *Id.* at 139.

In sum, the Final EA found that any potential downstream flooding as a result of wetland removal would be properly mitigated.[15]  *See id.* at 130, 139, 141. It also noted that wetland mitigation will be an ongoing commitment as the Project develops, stating several times that:

Wetlands will be mitigated, including required compensatory mitigation, in accordance with the permitting agency and it is the intent of the City of Gulfport that mitigation will occur within the Turkey Creek Watershed pending availability.  The [Corps] has the federal responsibility of determining the appropriate mitigation to off-set lost wetland functions that result from the proposed project.

*Id.* at 104, 129-30.  To further emphasize this commitment, the Final EA identifies the amount of wetland mitigation credits available for purchase in the surrounding areas, *see id.* at 130, and states that mitigation will continue to be coordinated as

---

[15] Again, this mitigation is not contingent on another agency's action, *see* R. [53-4] at 94, and it does not reclassify the FONSI at issue as a "mitigated" FONSI, *see Spiller*, 352 F.3d at 241; *Atchafalaya Basinkeeper*, 894 F.3d at 698.

56

the Project develops, *see* R. [53-4] at 95 (MDOT Commitments to Environmental Excellence). But the reference to the Corps does not mean that the DOT is relying "on some later review by another agency to establish mitigation . . . ," Mem. [69] at 33; the DOT already found that wetland impacts will be properly mitigated through the stormwater plan.

b.     Streams

Plaintiffs similarly argue that the Final EA fails to discuss mitigation measures for roughly 1,450 linear feet of streams set to be removed by the Project, *see* Mem. [69] at 31, 34; Reply [74] at 11, and that certain ephemeral streams were not properly included in FEMA maps, Mem. [69] at 31. In particular, Plaintiffs seem to focus on one "unnamed stream [that] is not included within the [Flood Insurance Study] and is therefore an unstudied stream with no determined base flood elevations . . . ." R. [53-5] at 133; *see also* R. [53-13] at 13 (same). Plaintiffs cite to internal FHWA correspondence in which one employee comments that the EA needs to do more to acknowledge the potential flood risks of the unmapped base floodplains related to the unnamed stream. *See* R. [64-4] at 8; Mem. [69] at 31 n.68.

However, this comment appears to be referencing an earlier draft of the EA as it was made before the Final EA was published. *Compare* R. [64-4] at 6 (comment emailed on June 3, 2022), *with* R. [53-4] at 93 (Final EA signed in September 2022). And importantly, the Final EA includes a Drainage Report, *see* R. [53-13] at 8-63, again finalized after this comment was made, *see id.* at 9 (report

57

finalized on July 29, 2022), that provides a greater analysis of the unnamed stream.
It states that:

> To address potential flood risk within these and other areas, the unnamed stream not mapped by FEMA was modeled in a 2D HEC-RAS model developed as part of the design and existing base floodplain extents established within the vicinity of the proposed project . . . . This section presents the hydrologic and hydraulic analysis necessary to establish the existing base floodplain and water surface elevations for the unnamed stream.

*Id.* at 18.

The final drainage report determined the existing base floodplain for the unnamed stream and included an analysis to ensure that there would be no adverse impacts regarding it. *Id.* at 13. To the extent that the Final EA did not analyze the stream beyond this, the DOT points out that it complied with applicable regulations in its floodplain analysis. *See* Resp. [72] at 29-30. Between the stormwater mitigation plan and the final drainage report, the DOT sufficiently explains at the EA stage how impacts to wetlands and other waters will be mitigated. *See* *Atchafalaya Basinkeeper*, 894 F.3d at 698-99; *Coliseum Square Ass'n, Inc.*, 465 F.3d at 239.

c.   Additional Environmental Findings

Ultimately, the Final EA went to great lengths to explain that the Project will not have a significant impact on the environment. In addition to the foregoing determinations, the Environmental Impact section made additional findings, such as: the Project not being a concern for air quality or noise, R. [53-5] at 116, 120; possible short-term effects to soils and water quality during construction that can

58

be mitigated mostly, if not entirely, through best management practices and a Storm Water Pollution Prevention Plan, *id.* at 58, 125; no impacts to groundwater, *id.* at 127; and long-term, though insignificant, effects on local vegetation and wildlife, *id.* at 143, 145.

These conclusions are supported by detailed discussions, studies, and expert reports. *See generally id.* at 50-169; *see also* R. [53-11] at 39 (Appendix D: Air Quality); R. [53-11] at 70 (Appendix E: Traffic Noise Analysis Technical Report); R. [53-12] at 17 (Appendix F: Wetland and Other Waters Assessment); R. [53-12] at 149 (Appendix G: Floodplain and Downstream Impact Assessment); R. [53-13] at 64 (Appendix H: Phase I Environmental Assessment). Again, the DOT's decision to issue a FONSI was not arbitrary or capricious. *See Atchafalaya Basinkeeper*, 894 F.3d at 698-99; *Coliseum Square Ass'n, Inc.*, 465 F.3d at 239.

E.    Post Hoc Rationalization Arguments

Finally, as the Fifth Circuit recently explained:

> It's a "simple but fundamental rule . . . that a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency." *SEC v. Chenery Corp*[.], 332 U.S. 194, 196 (1947). This idea, called the *Chenery* principle, means that appellate courts "may not accept appellate counsel's post hoc rationalizations for the agency action." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962). As the Court explained in *Burlington Truck Lines*, "*Chenery* requires that an agency's discretionary order be upheld, if at all, on the same basis articulated in the order by the agency itself." *Id.* at 168-69.

*Doe v. United States Dep't of Health & Hum. Servs.*, 165 F.4th 903, 905-06 (5th Cir. 2026) (cleaned up).

Plaintiffs identify six arguments in the DOT's response brief that they maintain are post hoc rationalizations. First is the fact that the DOT cites to the PEL study in defending its impact analysis. *See* Reply [74] at 3; Resp. [72] at 18. But the Final EA identified induced development as a potential impact of the Project and stated that further analysis of this issue was too speculative. *See* R. [53-5] at 163-66. The DOT makes that same argument now, *see* Resp. [72] at 18, and the Court affirms its decision on the same basis, *see* discussion *supra* Section IV.A. The fact that the DOT referenced the PEL study, among other parts of the record, does not alter this conclusion. *See Doe*, 165 F.4th at 905-06.

Second, Plaintiffs argue that by citing "cases holding the agency can confine its review of alternatives to those that meet the stated purpose and need," the DOT is making another post hoc rationalization. *See* Reply [74] at 7. In essence, Plaintiffs originally argued that Defendants did not consider alternatives that it otherwise should have. *See* Mem. [69] at 22-26. The DOT responded that it did not have to consider those alternatives and cited case law justifying this position. *See* Resp. [72] at 21-22. Plaintiffs now argue that this defense is a post hoc rationalization. *See* Reply [74] at 7. But if that were so, an agency could never defend itself. *Cf. Nat'l Oilseed Processors Ass'n v. Browner*, 924 F. Supp. 1193, 1204 (D.D.C. 1996) ("The rule against post [] hoc rationalizations does not prevent a court from considering a more detailed explanation of an agency's action in response to a legal challenge."), *aff'd in part and remanded sub nom. Troy Corp. v. Browner*, 120 F.3d 277 (D.C. Cir. 1997)).

"Third, Defendants make the *post* [] *hoc* argument that they can ignore all alternatives outside of Gulfport's jurisdiction because the City obtained the BUILD grant." Reply [74] at 7. The DOT never made such an argument. Plaintiffs' fourth and fifth arguments appear again to be attacking the DOT's ability to cite case law to explain its decision not to further analyze certain alternatives. *See* Reply [74] at 8; Resp. [72] at 24. Again, such arguments are unpersuasive. *See Browner*, 924 F. Supp. at 1204. Lastly, Plaintiffs argue that "Defendants offer a cryptic *post* [] *hoc* rationalization of counsel to justify their failure to provide any mitigation information for the 1,450 feet of ephemeral streams the project will destroy." Reply [74] at 11. This is a mischaracterization; the DOT explicitly argued that it did account for the ephemeral streams and cited to specific sections of the Final EA to support its argument. *See* Resp. [72] at 29-30; R. [53-5] at 133; R. [53-13] at 13.

Plaintiffs contend that practically every one of the DOT's arguments in defense of its decision is a post hoc rationalization. *See* Reply [74] at 3, 7, 8, 11. But they misapply the standard. *See Browner*, 924 F. Supp. at 1204. The DOT has defended its decision consistently, its decision is adequately reflected in the administrative record, and the Court will uphold that decision. *See Doe*, 165 F.4th at 905-06.

61

### V. CONCLUSION

The Final EA is the culmination of five years of research.  *See* R. [53-8] at 86. It went through two official drafts and is 228 pages long (over 2,500 pages long including appendices).  *See generally* R. [53-4] at 92 to -[53-20] at 87.  Given that the law merely requires that an EA be "rough-cut or low-budget," the only way to describe it here is "exceedingly thorough and comprehensive."  *Spiller*, 352 F.3d at 240 (characterizing in the same manner an EA that was one and half years in the making and consisted of four volumes totaling over 2,400 pages).  Accepting Plaintiffs' arguments and vacating the DOT's decision would cut against the Supreme Court's recent "course correction . . . to bring judicial review under NEPA back in line with the statutory text and common sense."  *Seven Cnty. Infrastructure Coal.*, 605 U.S. at 183-84.

Although the Final EA is not perfect, that is not the standard.  The Final EA demonstrates that the DOT's decision was not arbitrary or capricious, and judgment should be entered in its favor.  To the extent the Court has not specifically addressed any of the parties' remaining arguments, it has considered them and determined that they would not alter the result.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiffs National Council of Negro Women, the Education, Economics, Environmental, Climate and Health Organization, Healthy Gulf, and the Sierra Club's Motion [68] for Summary Judgment is **DENIED**.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, the decision of the United States Department of Transportation is **AFFIRMED**, and the Complaint [1] is **DISMISSED WITH PREJUDICE**.  The Court will enter a separate final judgment in accordance with Federal Rule of Civil Procedure 58.

**SO ORDERED AND ADJUDGED**, this the 17th day of March, 2026.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
CHIEF UNITED STATES DISTRICT JUDGE